[Cite as *State v. Moody*, 2016-Ohio-8366.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | C.A. CASE NO. 26926 |
| | : | |
| v. | : | T.C. NO. 14CR3237 |
| | : | |
| CURTIS A. MOODY | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . .

**O P I N I O N**

Rendered on the ___23rd___ day of _____December_____, 2016.

. . . . . . . . . .

ANDREW T. FRENCH, Atty. Reg. No. 0069384, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

JENNIFER S. DELAPLANE, Atty. Reg. No. 0089521, 127 W. Market Street, Troy, Ohio 45373
      Attorney for Defendant-Appellant

. . . . . . . . . . . .

FROELICH, J.

{¶ 1} Curtis A. Moody was convicted after a jury trial of two counts of murder (proximate result of felonious assault), two counts of felonious assault, and one count of having weapons while under disability. Moody was sentenced to an aggregate term of 21 years to life in prison.

{¶ 2} Moody appeals from his convictions, raising six assignments of error. For the following reasons, the trial court's judgment will be affirmed.

## I. Facts and Procedural History

{¶ 3} According to the State's witnesses at trial, at approximately 7:00 p.m. on July 17, 2014, Jeffrey Farr, Stanley Wilson, Garry Cosby,[1] Raymond Nicholson, Charles Dozier, and Dozier's sister, Cynthia, were socializing and drinking beer in a dirt lot next to a convenience store on Germantown Street in Dayton. Farr and Nicholson were sitting together on a make-shift bench, Cosby was sitting on the front of Wilson's truck, Charles Dozier was seated in his own truck, and his sister was leaning against the truck and talking with Wilson.[2] Moody, who was known as "Merk", crossed Germantown Street and approached the group; Farr, Wilson, and Nicholson were acquainted with Moody. Cosby noticed that Moody had a gun. Farr told Moody that Moody "better have [his] money," and an argument ensued. Moody pushed or punched Farr, and Farr picked up a board that was part of the make-shift bench and swung it at Moody. Cosby tried to guide Moody away, and Farr sat back down. However, Moody turned around and shot Farr six times from behind. Farr died from his injuries.

{¶ 4} When the shooting started, Charles Dozier yelled to his sister to get into his truck, and the two drove into one of the parking lots of the apartment complex across the

---

[1] Although the transcript identifies Cosby as "Gary Cosby," the record indicates that his first name is more accurately spelled "Garry."

[2] There are some discrepancies about where certain people were standing when Moody arrived. For example, Wilson testified that he was inside the store when the argument occurred and that, when he came out, Cosby was talking with Moody and Farr was standing with a board in his hand. These discrepancies are not pertinent to the issues before us.

street.   When Dozier got out of his truck to go to a family member's residence, he heard the shooter calling to him to take him (Moody) to the liquor store.   Dozier was afraid to deny the request, and he and his sister returned to the truck with Moody.   Moody directed Dozier to the rear of an apartment complex several miles way.

{¶ 5} Walter Jackson, who lived in the apartment complex across the street from the scene of the shooting, called 911 immediately after the shooting.   During the police investigation that followed, several witnesses to the shooting ultimately identified Moody as the shooter.   In addition, other individuals, including Moody's mother, indicated that they saw Moody near the site of the shooting, although they did not witness the shooting itself.   Moody was arrested in August 2014 in Nashville, Tennessee.

{¶ 6} In November 2014, Moody was indicted on two counts of felony murder, two counts of felonious assault (serious physical harm and deadly weapon, respectively), and two counts of having weapons while under disability.   The murder and felonious assault charges included firearm specifications.   Moody subsequently filed a motion to suppress, challenging, in part, the photo identifications made by several of the witnesses.   After a hearing, the trial court overruled the motion in February 2015.   On July 28, 2015, Moody filed a motion to suppress a photo identification by Cosby, who had identified Moody as the shooter two days before (July 26, 2015).   In September 2015, after a hearing, the trial court also overruled this motion to suppress.

{¶ 7} The matter proceeded to a jury trial on the murder and felonious assault charges in November 2015.   The charges of having weapons while under disability were tried to the court.   The jury found Moody guilty of both counts of murder and of felonious assault.   The trial court found Moody guilty of one count of having weapons while under

disability; it acquitted Moody of the second count.

{¶ 8} The trial court merged the murder and felonious assault charges and sentenced Moody to 15 years to life for murder. The court imposed 36 months for having weapons while under disability, to be served consecutively to the murder charge and to the sentence in another case (Case No. 2013 CR 2574). The court also imposed three years for the firearm specification, to be served prior to and consecutively to the definite term of imprisonment.

## II. Pretrial Photo Identifications

{¶ 9} In his first assignment of error, Moody claims that the trial court "erred in failing to suppress the photo identification[s] of Moody," which violated his right to due process.

{¶ 10} "Due process requires suppression of pre-trial identification of a suspect only if the identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification." *Neil v. Biggers*, 409 U.S. 188, 196-97, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

{¶ 11} The defendant must first show that the identification procedure was unduly suggestive. "A lineup is unduly suggestive if it steers the witness to one suspect, independent of the witness's honest recollection." (Citations omitted.) *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 208. If the pretrial identification procedure was not unfairly suggestive, any remaining questions as to the identification's reliability go to the weight of the identification, not its admissibility, and no further inquiry into the reliability of the identification is required. *Id.* at ¶ 209; *State v. Williams*, 2d Dist. Montgomery No. 26357, 2015-Ohio-1403, ¶ 13.

{¶ 12} If, on the other hand, the defendant shows that the pretrial identification procedure was unduly suggestive, the court must then consider whether the identification, viewed under the totality of the circumstances, is reliable despite the suggestive procedure. *Id.* In reviewing the likelihood that the circumstances resulted in a misidentification, courts have considered the opportunity of the witness to view the perpetrator at the time of the offense, the witness's degree of attention, the accuracy of the witness's prior description of the perpetrator, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.[3] *Neil* at 199-200; *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *State v. Chaffin*, 2d Dist. Montgomery No. 25220, 2014-Ohio-2671, ¶ 16.

{¶ 13} Reliability of the pretrial identification is the linchpin in determining its admissibility. *Manson* at 114. "So long as the identification possesses sufficient aspects of reliability, there is no violation of due process." *State v. Sherls*, 2d Dist. Montgomery No. 18599, 2002 WL 254144, *3 (Feb. 22, 2002).

{¶ 14} We review a trial court's refusal to suppress a pretrial identification for an abuse of discretion. *State v. Wilson*, 2d Dist. Montgomery No. 22624, 2009-Ohio-1038,

---

[3] We have previously noted that several factors identified in *Neil* may bear reconsideration in light of the significant advancement of scientific understanding of memory. *See State v. Frazier*, 2016-Ohio-727, 60 N.E.3d 633, ¶ 18, fn. 1 (2d Dist.). For example, *Neil* and *Manson* direct courts to consider the witness's degree of certainty in the identification, yet studies have repeatedly shown little relationship between certainty and accuracy. Nonetheless, as an intermediate court of appeals, this court must continue to follow the factors articulated in *Neil* and *Manson*, as required by Ohio Supreme Court precedent. *See, e.g.*, *State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, ¶ 25 (considering the *Manson* factors in determining reliability of identification); *State v. Keith*, 79 Ohio St.3d 514, 684 N.E.2d 47 (1997).

¶ 19.

{¶ 15} According to the evidence at the suppression hearings, Detective Thomas Cope, a homicide detective with the Dayton Police Department, was in charge of the investigation of the shooting death of Jeffrey Farr on July 17, 2014. Soon after the investigation began, Moody became a suspect in the shooting.

{¶ 16} On July 21, 2014, Cope created a photo spread with six photographs using an application called JusticeWeb. Cope used the latest jail book-in photograph for Moody that was on JusticeWeb – a photo from October 2013 -- and used default parameters for the program to find comparable photographs. Under the default parameters, the program identified individuals that were within five years of Moody's age, within four inches of his height, and within 25 pounds of his weight. Cope provided Moody's race, hair color, eye color, and gender as additional parameters. The computer identified several hundred comparable individuals for the "filler" photographs for the photo line-up.

{¶ 17} Detective Cope manually reviewed the computer-identified comparable photographs and looked for people with similar hairstyles, facial features, photo backgrounds, and skin complexion in an effort to make the photographs "as homogeneous as possible so there's not one that stands out over the others." Cope selected five photographs, and the program created a photo spread, positioning the photographs within the spread at random (Supp. State's Ex. 1/Tr. State's Ex. 37[4]).

---

[4] The original photo spreads were presented at both the suppression hearing and at trial. At trial, the exhibits were renumbered. However, the court indicated at trial that it had kept copies of the photo spreads with the original exhibit numbers from the suppression hearing.

Detective Cope testified that he failed to "save" the photo spread, so that he could reprint it at a later date. When Cope printed the photo spread, one of the pages listed each individual's name and birthdate underneath his respective photo; Cope testified that this page is kept separately from the rest of the photo spread packet.

{¶ 18} The July 21 photo spread was shown to Charles Dozier. Dozier identified the individual in photo #1 as the person who "may have shot Jeff," and he initialed next to the photograph he selected. Dozier indicated to the officer who presented the photo spread that "this guy resembles him." Moody's photo was photo #6 in the July 21 photo spread.

{¶ 19} On July 28, 2014, Detective Cope used JusticeWeb to create a new photo spread. He used Moody's October 2013 photograph and selected five filler photographs from the hundreds of photographs that were generated using the same criteria as before. Two of the five filler photos were the same as those in the July 21 photo spread, and three of the filler photos were of new people. The individual that Dozier had selected was not included in the five filler photos. Detective Cope saved the photo spread as a file on his computer so that he could access it again at a later date.

{¶ 20} Cope had JusticeWeb generate two photo spread packets with these six individuals (Moody plus the five filler photos). (State's Ex. 2/31 and 3/35.) Although the six photographs were the same in both Exhibits 2 and 3, the computer randomly positioned the photographs in different positions.

{¶ 21} Detective Rod Roberts, an officer who did not have any involvement in the investigation into Farr's shooting, showed State's Exhibit 2 to Stanley Wilson and State's Exhibit 3 to Raymond Nicholson in different rooms at the police station. Cope did not

provide Roberts any information about the suspect or the investigation.

{¶ 22} Roberts testified that he first administered the photo spread to Wilson. Prior to showing the photo spread to Wilson, Roberts read the photo spread instructions to Wilson verbatim. The instructions read:

> I am going to show you a group of photographs. This group of photographs may or may not contain a picture of the person who committed the crime now being investigated. I do not know who the suspect is. Keep in mind that hair styles, beards, and moustaches may be easily changed. Also, photographs may not always depict the true complexion of a person. Pay no attention to any markings or numbers that may appear on the photos or any differences in the type or style of the photographs. When you have looked at all of the photos, tell me whether or not you see the person who committed the crime or any other person you recognize. Do not tell other witnesses that you have or have not identified anyone.

Roberts indicated on the form that he was a blind administrator.

{¶ 23} Wilson identified Moody's photo, which was photo #2. Detective Roberts asked Wilson to circle the photograph, initial it, and sign at the bottom of the page. Roberts also asked Wilson to write the number of the photograph he had selected on page 2 of the packet, write what the identified person did, indicate his percentage of certainty, and sign at the bottom of the page. On page 4 of the packet, Wilson put a checkmark next to "YES" for photo #2 and wrote, "He shot Jeff Farr." Detective Roberts then returned the packet to Detective Cope.

{¶ 24} Within minutes, Detective Roberts went into a separate interview room to

show a photo spread to Nicholson. Roberts employed the same procedure when he presented the photo spread to Nicholson. Nicholson selected photo #3, which was Moody's photo. After Nicholson made his identification and completed the requested portions of the photo spread packet, Nicholson returned the packet to Detective Cope.

{¶ 25} On October 22, 2014, Detective Cope generated another photo spread using the same six photographs that he had selected on July 28 (State's Ex. 4/32). JusticeWeb scrambled the photographs so that they were in a different order than either of the photo spreads printed on July 28; Moody's photograph was photo #6.

{¶ 26} Detective Cope asked Officer Matt Heiser, an officer who was not involved in the investigation, to present the photo spread to Walter Jackson. The two officers drove to Jackson's residence, and Cope explained to Jackson that Heiser would be conducting a lineup with him (Jackson). Detective Cope then went outside the residence while Officer Heiser presented Jackson with the photo spread.

{¶ 27} As with Detective Roberts, Officer Heiser read the instructions to Jackson verbatim and then gave Jackson the photo spread. Jackson identified Moody's photo. Heiser asked Jackson to circle it, initial it, date it, and sign at the bottom. Jackson complied. Officer Heiser wrote on page 2, "As soon as I handed him the photo he pointed at number 6 and said that's him." Heiser checked "YES" next to "photo #6" on page 2, indicating that he had selected that photo. At this point, Heiser put the photo spread packet back in a folder and walked out of the house to get Detective Cope.

{¶ 28} On July 26, 2015, Detective Cope created another photo spread to show to Cosby, again using the six-photo photo spread that he had created on July 28 (State's Ex. 6/36). When he printed the photo spread, the order of the photos was again

reshuffled.

{¶ 29} Detective Cope asked Detective Cayce Cantrell, a detective with the Special Victim's Unit, to administer a photo spread. Cantrell was unfamiliar with Cope's homicide investigation. Cope introduced Cantrell to Garry Cosby, the witness, and Cantrell took Cosby into the homicide department's conference room and read him the instructions on page one of the photo spread packet. Detective Cantrell initialed the instructions and marked that she was a blind administrator.

{¶ 30} Cantrell placed the photo spread in front of Cosby, and he pointed to photo #2, which was Moody's photo, within 15 seconds. Cantrell had Cosby circle and initial the photo that he had selected and sign the page. On page 2 of the packet, Cantrell marked that Cosby had selected photo #2 and had not selected photos #1 and #3-6. On page 3, Cosby filled in the statement that he recognized the person in photo #2 as the person who "shot Jeff." Cosby wrote that he was "sure that's him." Cosby signed the bottom of page 3. Cantrell signed as a witness, and returned the photo spread to Detective Cope.

{¶ 31} Moody moved to suppress the pretrial identifications of him as impermissibly suggestive.[5] The trial court overruled the motion, reasoning:

Defendant did not contest that the witnesses who identified him through the photo line-up had the opportunity to observe him on the night in question. The Court has reviewed the line-ups generated by Cope and finds them to be appropriate. Defendant does not stand out in any way and the other

---

[5] Moody also moved to suppress evidence obtained pursuant to a search warrant. This issue is not relevant to this appeal.

persons in the line-ups have similar physical characteristics. Further, the testimony of Cope, Roberts and Hieser [sic] establishes that the line-ups were appropriately administered by blind administrators. Accordingly, the photo line-up identifications will not be suppressed.

{¶ 32} On appeal, Moody focuses on the fact that Charles Dozier identified a person from the July 21 photo spread who was not included in any of the subsequent photo spreads that were shown to witnesses. Where witnesses were shown versions of the photo spread prepared on July 28 (which did not contain the individual that Dozier had identified), witnesses identified Moody.

{¶ 33} Upon review of the evidence from the suppression hearing, including the photo spread packets presented to the witnesses, the identification procedure employed by the Dayton police was not unduly suggestive. The photo spreads were presented by blind administrators, and there was nothing in the manner in which the officers administered the photo spreads that would make the presentations unduly suggestive.

{¶ 34} As to the photo arrays generated by the photographs selected by Detective Cope on July 28, the arrays were computer-generated, using characteristics that were similar to Moody. The photographs had similar backgrounds, and the individuals had similar facial features and hairstyles. We find nothing unduly suggestive in the photographs that were selected. The fact that the photographs selected on July 28 did not include the individual identified by Charles Dozier on July 21 did not render the July 28 photo spread (and the additional photo spreads later created from the same group of photographs) unduly suggestive. The fact that the subsequent photo spreads did not contain the picture identified by Dozier in the first was thoroughly explored by defense

counsel. In addition, each of the witnesses was told prior to being shown the photo spread that the perpetrator's photograph might not be present and that some physical features might have changed.

{¶ 35} The trial court did not err in overruling Moody's motion to suppress. The first assignment of error is overruled.

### III. Motion for a Continuance/ *Brady* Material

{¶ 36} In his second assignment of error, Moody claims that the trial court erred in failing to grant him a continuance, which was based on the State's late disclosure of alleged *Brady* material. Although not specifically stated as part of the assignment of error, Moody further claims that his due process rights were violated as a result of the State's alleged *Brady* violation and the State's failure to authenticate cruiser videos at trial.

{¶ 37} "The trial court has discretion to regulate discovery in a manner consistent with Crim.R. 16. If it comes to the court's attention that a party has not complied with Crim.R. 16, the trial court may 'order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances.' Crim.R. 16(L)(1)." *State v. Mobley*, 2d Dist. Montgomery No. 26858, 2016-Ohio-4579, ¶ 23.

{¶ 38} The trial court has broad discretion to grant or deny a motion for a continuance. *State v. Bones*, 2d Dist. Montgomery No. 26017, 2015-Ohio-784, ¶ 61. In exercising its discretion, a trial court should consider "the length of the delay requested; whether other continuances have been requested and received; the inconvenience to

litigants, witnesses, opposing counsel and the court; whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; whether the defendant contributed to the circumstance which give [sic] rise to the request for a continuance; and other relevant factors, depending on the unique facts of each case." (Citation omitted.)   *State v. Bocock*, 2d Dist. Montgomery No. 22481, 2008-Ohio-5641, ¶ 23.

{¶ 39} In a sidebar discussion during Wilson's testimony (the State's second witness on Tuesday, November 10, 2015), the prosecutor informed the Court and defense counsel that it was going to display a still photograph taken from a police cruiser video. The still photograph portrayed Farr's body on the ground and several people standing around, including Wilson.   During this discussion, defense counsel stated:

> I'm just going to renew my objection on the whole issue that these are pictures that came from the cruiser cam that I just received on Saturday. So, I just want to put that on the record that that's where these come from. These pictures are stills taken from those, so the objection, just to make sure the record reflects the objection based on the request for a continuance, because I just saw these on Saturday.

The trial court overruled the objection.

{¶ 40} Based on defense counsel's objection on November 10, it appears that the State provided certain exhibits to defense counsel during the afternoon of Saturday, November 7, 2015; the case proceeded to trial on Monday, November 9.   No written motion for a continuance was filed on or after November 7, 2015, and the transcript does not contain any discussion of a request for a continuance between November 7, 2015

and the November 10 sidebar discussion. There was a "renewed objection," but no suggestion as to any prejudice.

{¶ 41} During the trial, defense counsel stated that the following exhibits were disclosed on November 7: a CD of the 911 calls (Exhibit 86/Court's Exhibit IV), a DVD of seven cruiser videos (Exhibit 83), three still photographs from a cruiser video (Exhibits 27-29), and a transcript of Rhonda Alves's statement recorded on a cruiser video (Court's Exhibit V). The seven cruiser videos were the following approximate lengths, respectively: (1) 21 minutes, (2) 10 minutes, (3) 28 minutes, (4) 6 minutes, (5) 1.5 minutes, (6) 25 minutes, and (7) 20 seconds. The CD of 911 calls contained seven 911 calls, totaling 6 minutes and 54 seconds. Based on the number of photographs and the length of the videos and 911 calls, the trial court could have reasonably determined that defense counsel had an adequate opportunity to review the exhibits in advance of trial. Given the limited record before us on this issue and the lack of any apparent prejudice, we cannot conclude that the trial court abused its discretion in failing to continue the scheduled November 9 trial date.

{¶ 42} Moody further claims that the State failed to timely disclose certain exhibits, which violated his due process rights pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

> In *Brady*, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Favorable evidence under *Brady* encompasses both exculpatory and impeachment evidence, and

evidence must be both favorable and material before disclosure is required. Evidence is material within the meaning of *Brady* only if there exists a " 'reasonable probability' " that the result of the trial would have been different had the evidence been disclosed to the defense. "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."

(Citations omitted.) *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 338. The defense bears the burden of proving a *Brady* violation that rises to the level of a denial of due process. *State v. Iacona*, 93 Ohio St.3d 83, 92, 752 N.E.2d 937 (2001).

{¶ 43} Moody argues that a *Brady* violation occurred, because the State "suppressed" a cruiser video and still photographs taken from that video. He further states that he was prejudiced by the suppression of this evidence, because the trial court denied him a continuance after this evidence was untimely disclosed.

{¶ 44} "The rule in *Brady* only applies to evidence unknown to the defendant at the time of the trial." *State v. Royster*, 2d Dist. Montgomery No. 26378, 2015-Ohio-625, ¶ 17. And, "[e]ven where information may be exculpatory, '[n]o due process violation occurs as long as *Brady* material is disclosed to a defendant in time for its effective use at trial.' " (Citation omitted.) *Iacona* at 100.

{¶ 45} Here, even assuming that the cruiser video and still photographs were exculpatory or impeachment evidence, the State disclosed the cruiser video and the still photographs prior to trial, albeit belatedly, and there is no indication that the disclosure was so late that Moody was unable to adequately prepare for trial or was otherwise prejudiced. Moody has not demonstrated that his due process rights, as interpreted by

*Brady*, were violated.

{¶ 46} Finally, Moody states that the cruiser videos were never authenticated. However, Moody did not raise an authentication argument at trial. Accordingly, we review the issue for plain error.

{¶ 47} In order to constitute plain error, the error must be an obvious defect in the trial proceedings, and the error must have affected substantial rights. *State v. Norris*, 2d Dist. Montgomery No. 26147, 2015-Ohio-624, ¶ 22; Crim.R. 52(B). Plain error should be noticed "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

{¶ 48} Officer Alexander Magill, who responded to the scene of the shooting, testified that his cruiser had an in-car camera that digitally recorded out the front windshield and another camera that recorded the rear passenger seat; the cameras were activated when the overhead lights were used. Magill stated that the monitors in the cruisers provide options for saving the cruiser videos, based on how the video is "flagged," such as for an arrest, evidence, traffic stop, and so on. Magill testified that he flagged the video to be saved, and that the case detective would be responsible for creating a compact disk (CD) and delivering that to the prosecutor's office. Magill stated that the cruiser video CDs "always have a certain look to them." Magill identified State's Exhibit 83, the CD containing cruiser videos, as looking like a CD that would contain cruiser videos.

{¶ 49} The State did not offer the cruiser videos as substantive evidence of Moody's guilt. Rather, portions of one of the cruiser videos were played for the jury

during Detective Cope's testimony for purposes of impeaching Alves's testimony (i.e., on the questions of whether Farr was swinging a branch or stick at her son and whether she saw her son walking away from the scene of the shooting). During the discussion of the admission of evidence, Exhibit 83 was not admitted into evidence, because it was used solely for impeachment.

{¶ 50} With the record before us, we find no plain error in the State's use of the cruiser video at trial.

{¶ 51} Moody's second assignment of error is overruled.

### IV. Court's Witnesses, Misconduct, and Hearsay Evidence

{¶ 52} Moody's third assignment of error raises three issues. First, he claims that the trial court erred in treating two witnesses – Zaneta White and Rhonda Alves – as court's witnesses. Second, he claims that the prosecutor committed misconduct "during exam and through introduction of substantive hearsay testimony and evidence through the guise of impeachment which otherwise procedurally would not have been permitted." Third, he claims, alternatively, that certain relevant evidence should have been excluded as unfairly prejudicial.

*A. Court's Witnesses*

{¶ 53} Under Evid.R. 614(A), "[t]he court may, on its own motion or at the suggestion of a party, call witnesses, and all parties are entitled to cross-examine witnesses thus called." The purpose of calling a witness as a court's witness is to allow for a proper determination in a case where a witness is reluctant or unwilling to testify. *State v. Renner*, 2d Dist. Montgomery No. 25514, 2013-Ohio-5463, ¶ 18. "A witness whose appearance is important to the proper determination of the case, but who appears

to be favorable to the other party, is a principal candidate for application of Evid.R. 614(A)." *State v. Croom*, 2d Dist. Montgomery No. 25094, 2013-Ohio-3377, ¶ 73, citing *State v. Curry*, 8th Dist. Cuyahoga No. 89075, 2007-Ohio-5721, ¶ 18.

{¶ 54} Pursuant to Evid.R. 607, the State normally would not be allowed to impeach its own witness through a prior inconsistent statement unless it could show surprise and affirmative damage. However, "[w]hen the court calls a witness on its own motion, a party need not satisfy the surprise and affirmative-damage requirements of Evid.R. 607(A) in order to impeach the witness." *State v. Slaughter*, 2d Dist. Montgomery No. 25215, 2014-Ohio-862, ¶ 4. The purpose of the rule is to prevent such a witness from testifying in a manner that is substantially at variance with the witness's prior statements, thereby causing the State to be "stuck" with having elicited testimony harmful to the State out of the mouth of its own witness. *State v. Jones*, 2d Dist. Montgomery No. 14731, 1996 WL 38940, *4 (Jan. 31, 1996).

{¶ 55} " 'As a practical matter courts will approach the exercise of the right to call witnesses with some degree of circumspection since merely presenting a person as the court's witness may clothe that witness with an enhanced measure of dignity and prestige' in the eyes of a jury and may be an 'unwarranted invasion of the adversarial system.' " *State v. Hazel*, 2d Dist. Clark No. 2011 CA 16, 2012-Ohio-835, ¶ 34, quoting *State v. Combs*, 9th Dist. Summit No. 15025, 1991 WL 259530, *2 (Dec. 4, 1991). However, the decision whether to call a court's witness pursuant to Evid.R. 614(A) is within the discretion of the trial court and will be reversed only for an abuse of discretion. *Id.* at ¶ 34; *Croom* at ¶ 74.

{¶ 56} On November 6, 2015, the Friday before trial, the State filed two motions

asking the court to designate Zanetta White, the mother of two of Moody's children, and Rhonda Alves, Moody's mother, as court's witnesses, pursuant to Evid.R. 614(A). In its motion regarding White, the State stated, "Due to her loyalties to the father of her children the State is unaware to what extent Ms. White will actually testify." With respect to Alves, the State stated, "Due to her loyalties to her son, and her current hesitation to be forthcoming about what she witnessed, the State is unaware to what extent Rhonda Alves will actually testify." The court declined to rule on the motions prior to trial.

{¶ 57} White was the State's last witness on Tuesday, November 9. Before White was called to the stand, the court mentioned in a sidebar discussion that "[w]e haven't had a chance to discuss" the motion to call White as a court's witness. The court stated, "I think I'll have you start just regularly. But it if appears that she's not cooperating, she goes right into court witness mode." The prosecutor responded, "And we'll come to sidebar if that happens."

{¶ 58} During the trial, the prosecutor did not renew the request for the court to designate White a court's witness or "come to side bar," and the trial court did not designate her a court's witness. During White's testimony, she stated that she lived in the rear of an apartment complex off Shiloh Springs Road on July 17, 2014, that she became aware of a shooting that had occurred, that Moody came to her apartment that evening, and he left after she told him to leave. White further testified that, since Moody's arrest, she has received letters (State's Ex. 39A & 39B) and telephone calls (State's Ex. 38) from Moody, in which Moody expressed that White should not have talked to the police and that she should not talk to the police or appear in court in the future. The prosecutor used several leading questions, without objection from defense counsel.

{¶ 59} We find no plain error in the prosecutor's questioning of White. Evid.R. 611(C) provides that "[l]eading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony." Nevertheless, a trial court may permit the use of leading questions during direct examination in its sound discretion. *Wolf v. Rothstein*, 2016-Ohio-5441, 61 N.E.3d 1, ¶ 85 (2d Dist.). Evid.R. 611(C) further permits the use of leading questions "[w]hen a party calls a hostile witness, an adverse party, or a witness identified with an adverse party."

{¶ 60} Having reviewed the entire transcript, we cannot conclude that the prosecutor's use of leading questions was plain error. The prosecutor's questioning guided White's testimony, but we find nothing to suggest that the manner of questioning was prejudicial. Moreover, White testified that Moody fathered two children with her, that Moody had lived with her on and off, and that Moody had been to her apartment in the days before the shooting and on the night of the shooting. The trial court could have reasonably concluded that White was a witness "identified with an adverse party."

{¶ 61} Rhonda Alves, Moody's mother, testified on November 12, 2015. She testified that she resided at the apartment complex across from the site of the shooting on July 17, 2014, and that Moody and Farr knew each other. When asked if she remembered seeing her son at the lot and if Farr was there with a "stick" on the day of the shooting, Alves initially testified that she did not. However, she then testified that she had seen Farr with a board and agreed that she did see Farr at the lot. At that juncture, the State asked for Alves to be designated a court's witness. Over defense counsel's objection, the court agreed.

{¶ 62} We find no abuse of discretion in the trial court's decision to designate Alves

as a court's witness. Alves initially testified that she did not remember if she saw Farr or her son in the dirt lot on the day of the shooting. Immediately after that testimony, she provided contradictory testimony that she did see Farr and others in the dirt lot that day. Given Alves's relationship to the defendant and her initial evasive testimony, the trial court did not abuse its discretion in declaring Alves a court's witness.

*B. Misuse of Hearsay Evidence*

{¶ 63} Second, Moody claims that the State improperly introduced, as impeachment evidence, the content of jail telephone calls, jail letters, and a cruiser video of Alves's statement to the police. He argues that the content of these items constituted inadmissible hearsay.

{¶ 64} Evid.R. 801(C) defines hearsay as a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." A "statement," as included in the definition of hearsay, is an oral or written assertion or nonverbal conduct of a person if that conduct is intended by him as an assertion. Evid.R. 801(A). "An 'assertion' for hearsay purposes 'simply means to say that something is so, e.g., that an event happened or that a condition existed." (Emphasis and citations omitted.) *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 97. Assertions can generally be proven true or false. *Id*. In general, hearsay is not admissible. Evid.R. 802.

{¶ 65} Certain statements are excluded from the definition of hearsay, including statements of a party-opponent where the statement is offered against that party. Evid.R. 801(D)(2)(a); *State v. Cole*, 2d Dist. Miami No. 2013 CA 18, 2014-Ohio-233, ¶ 36. In addition, there are several exceptions to the hearsay rule.

**{¶ 66}** Moody argues, citing Evid.R. 803(8), that statements found in certain police records or reports cannot be used in the State's case-in-chief. That Rule excludes from the hearsay rule:

Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (a) the activities of the office or agency, or (b) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, *excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, unless offered by defendant, unless the sources of information or other circumstances indicate lack of trustworthiness.*

(Emphasis added.) However, Evid.R. 803(8) does not apply to recordings of telephone calls by jail inmates, cruiser video recordings, or letters sent by inmates from the Montgomery County Jail; none of these items is a record or report setting forth the activities of a public office or agency or a matter observed pursuant to a duty imposed by law and that must be reported.

**{¶ 67}** During White's testimony, the State introduced two letters written by Moody to White and the recording of telephone calls from Moody to White while Moody was incarcerated at the Montgomery County Jail. The letters were heavily redacted before they were admitted into evidence. In Exhibit 39A, Moody wrote that White should "stick to the demo" and say that he was out of town. Exhibit 39B consisted of statements by Moody instructing White not to talk to the police and not to come to court. The statements in the letters were admissions by Moody, which are excluded from the hearsay rules. *See* Evid.R. 801(D)(2). And, the State was entitled to offer this evidence as

substantive evidence of Moody's guilt.

{¶ 68} Similarly, the recording of Moody's telephone calls from the jail to White were offered for the statements by Moody. In the first telephone call, Moody asked White to read his letters because they are important. In the second call, Moody suggested to White that she not come to court. Moody's statements constituted admissions of a party opponent, which are not hearsay (Evid.R. 801(D)(2)), and they were admissible against him as substantive evidence of his guilt. While the recorded telephone calls also included White's responses to Moody, we find no suggestion that White's responses were offered for the truth of the matter asserted.

{¶ 69} During Detective Cope's testimony, the State presented a portion of a cruiser video, which recorded an interview of Alves by Dayton police detectives during the evening of the shooting. The State agreed at trial that the video was offered solely for the purpose of impeaching Alves.

{¶ 70} Following the court's ruling that Alves could be considered a court's witness, Alves testified that she saw Farr swinging a "stick", but "I don't know who he was swinging it at." She acknowledged that she had spoken with a police officer after the shooting had occurred and told a police officer that she had seen Farr swinging a stick at Moody, that she heard the gunshots, and that she saw Farr on the ground.

{¶ 71} Alves further testified that she later spoke to a detective while sitting in a cruiser. Alves stated that she told the detective that she saw Farr swinging a stick or branch at her son, that she thought the arguing was "horseplay", that she closed her door, and that not long afterward she heard gunshots. Alves testified that she opened her door and saw someone on the ground and a person that looked like her son walking away.

She emphasized, "I said I thought I saw my son. I didn't say I saw him." Alves testified that she called Moody's name, but the person did not turn around. Alves testified that she did not recall telling the detective that she saw Moody walking down Germantown Street. Alves testified that the police searched her apartment for Moody and that she gave the police the names of two former girlfriends of Moody.

{¶ 72} During cross-examination, Alves testified that she did not get a good look at the person who was arguing with Farr and that when she called to him thinking he might be Moody, the man did not turn around. Alves further testified that when the police asked her where Moody might be, she mentioned a girlfriend in West Carrolton, but did not recall mentioning White. Alves indicated that she was under the influence of alcohol, marijuana, and cocaine on the night of the shooting, which altered her perception.

{¶ 73} On redirect examination, the State questioned Alves about her being under the influence of alcohol and drugs and whether Moody had instructed her to testify to that in court. The State played a recording of a jail conversation between Alves and Moody (State's Ex. 38), in which Moody attempted to influence Alves's testimony.

{¶ 74} On recross examination, Alves reiterated that she did not see the shooting, that she was actually under the influence of drugs and alcohol on the day of the shooting, that she did not talk to Moody between the shooting and when she spoke to the police, and that her testimony was not influenced by Moody.

{¶ 75} The State did not play any of the recording of Alves's statement to the police detectives during Alves's testimony. Instead, it later played two small portions of the recording during Detective Cope's testimony. In those portions, Alves told the detectives that she saw Moody and Farr arguing and Farr swinging a branch at her son, and that

she saw her son walking away from the scene after the shooting.

{¶ 76} Evid.R. 613(B) contemplates the use of extrinsic evidence of a prior inconsistent statement, provided that certain circumstances exist. *See State v. McKelton*, Ohio Sup.Ct. Slip Opinion No. 2016-Ohio-5735, ¶ 125. Under that Rule, extrinsic evidence of a prior inconsistent statement is admissible:

(1) If the statement is offered solely for the purpose of impeaching the witness, the witness is afforded a prior opportunity to explain or deny the statement and the opposite party is afforded an opportunity to interrogate the witness on the statement or the interests of justice otherwise require;

(2) The subject matter of the statement is one of the following: (a) A fact that is of consequence to the determination of the action other than the credibility of a witness; (b) A fact that may be shown by extrinsic evidence under Evid.R. 608(A), 609, 616(A), or 616(B); (c) A fact that may be shown by extrinsic evidence under the common law of impeachment if not in conflict with the Rules of Evidence.

{¶ 77} "As a general rule, 'prior inconsistent statements constitute hearsay evidence and thus are admissible only for the purpose of impeachment.' Accordingly, unless another hearsay exception applies, a party may not interrogate his own witness about a prior inconsistent statement ' "for the purpose of offering substantive evidence against the accused." ' " (Citations omitted.) *McKelton* at ¶ 128.

{¶ 78} Because Alves had been designated a court's witness, both the State and the defense were permitted to impeach her with any prior inconsistent statements. At trial, Alves testified that she had seen someone who looked like her son arguing with Farr

prior to the shooting and walking down Germantown Street following the shooting. In her prior recorded statement, Alves identified the person as her son.

**{¶ 79}** The prosecutor did not play, during Alves's testimony, the portion of the cruiser video in which she had made statements that differed from her trial testimony. However, she was repeatedly asked if she remembered speaking with detectives in a cruiser following the shooting (she answered that she did), and if she recalled telling detectives that she saw her son arguing with Farr and walking away down Germantown Street; Alves testified that she could not identify the person in the confrontation with Farr as her son, and she expressly denied telling detectives that she had seen her son walking away after the shooting. Thus, Alves was presented with the substance of her prior inconsistent statement and was afforded an opportunity to explain or deny it. Although the better course may have been to play the excerpts of the cruiser video during the impeachment of Alves, rather than during Detective Cope's testimony, the State was permitted to present extrinsic evidence of this prior inconsistent statement for purposes of impeaching Alves's testimony that the person who was with Farr and walked away from the scene only looked like her son. And, under the facts of this case, the use of the cruiser video during Cope's testimony was, at most, harmless error.

C. *Undue Prejudice*

**{¶ 80}** Alternatively, Moody claims that, even if the content of the jail telephone calls, jail letters, and the cruiser video were admissible, they should have been excluded because the prejudice that resulted from their admission outweighed their probative value.

**{¶ 81}** Relevant evidence is generally admissible whereas irrelevant evidence is

not. Evid.R. 402. "Relevant evidence" is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. Relevant evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. Evid.R. 402; Evid.R. 403(A). Decisions regarding the admissibility of evidence at trial are within the broad discretion of the trial court and will be upheld absent an abuse of discretion and material prejudice. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 86; *State v. Haines*, 112 Ohio St.3d 393, 2006-Ohio-6711, 860 N.E.2d 91, ¶ 50.

{¶ 82} The jail telephone calls, letters, and the cruiser video of Alves's statement were relevant to establish the identity of the perpetrator, i.e., that Moody was the shooter. The evidence was prejudicial to Moody in that it tended to demonstrate that Moody was, in fact, the shooter. The evidence was not unfairly prejudicial, and it did not create a risk of confusing the issues or misleading the jury. The trial court did not abuse its discretion in allowing the exhibits to be presented at trial.

{¶ 83} Moody's third assignment of error is overruled.

### V. Hearsay Evidence

{¶ 84} In his fourth assignment of error, Moody claims that the testimony of multiple witnesses included inadmissible hearsay statements and that the cumulative effect of these hearsay statements deprived him of a fair trial. Moody cites to testimony by Wilson, Cosby, Nicholson, Charles Dozier, Cynthia Dozier, White, Alves, and Cope. Moody also notes that several statements by Farr were admitted, although he made no

dying declaration.

*A. Stanley Wilson*

**{¶ 85}** First, Moody cites testimony about a conversation that Wilson had with his (Wilson's) nephew prior to the confrontation between Farr and Moody. Wilson's nephew was at the lot on July 17, 2014, but left prior to the confrontation between Farr and Moody. In response to the prosecutor's question about who was at the lot and whether they were drinking alcohol or beer, Wilson testified:

> We were drinking beers, me – well, my nephew bought the beer, he pulled
>
> up and said, Uncle, what's up? I said, nothing. He said, I just got work,
>
> he said, you want a beer? I said, yeah. So, he went in the store, bought
>
> a 12-pack of beer. So, it was us four, five sitting out there drinking beer.

**{¶ 86}** Wilson's testimony about his conversation with his nephew was background information that was not offered for the truth of the matter. And, because that conversation had no bearing on the murder itself, the admission of those statements was not prejudicial to Moody.

**{¶ 87}** Moody next objects to Wilson's testimony as to what Cynthia Dozier said to him. Wilson testified that, after he came out of the store, he went over to Charles Dozier's truck to talk with Cynthia. Cynthia reportedly stated, "Hey, Stan." Cynthia's greeting to Wilson was not an "assertion." Accordingly, it does not fall within the definition of hearsay. *See* Evid.R. 801. And, again, the trial court's admission of that statement was not prejudicial to Moody.

**{¶ 88}** Third, Wilson testified without objection that, immediately after the shooting, he asked Moody, "Man, what's wrong with you?" When the prosecutor asked a second

time what Wilson had said to Moody after the shots were fired, Wilson again testified, "I said, 'Man, what the f**k wrong with you?'" These statements were not assertions, and they were not offered for the truth of the matter asserted. Even if they constituted hearsay, given the circumstances, they would likely have been admissible under the excited utterance exception to the hearsay rule. *See* Evid.R. 803(2).

{¶ 89} Wilson also testified that, prior to entering the store, his nephew noticed Moody across the street at the bus stop. The nephew asked Wilson, "What's wrong with him?" Again, this question is not an assertion, and the nephew's question was not offered for the truth of the matter asserted and was not unfairly prejudicial to Moody.

{¶ 90} Finally, Moody challenges the following exchange:

[PROSECUTOR]: Why did you tell the police, the next day, who did it? If you didn't want to be involved?

[WILSON]: I didn't want to be involved, but as they brought me down here, and started talking to me and whatnot and whatever, like I said, he was messed up, people – like I said, again, he was my friend. *I said, "He's my friend and this what happened, and this is what I saw."*

(Emphasis added.) This also is not a hearsay statement; Wilson was explaining his actions, and his explanation was not unfairly prejudicial to Moody.

*B. Garry Cosby*

{¶ 91} Moody challenges portions of Cosby's testimony, where he relates part of a conversation between himself and Farr. Cosby testified that, when Farr picked up a board and started swinging it at Moody, Cosby asked Farr "what the hell are you doing" and told Farr "that man's got a gun." Cosby testified that Farr responded, "F**k that

ni**er's gun," and then sat down.

{¶ 92} Neither Cosby's question to Farr ("what the hell are you doing") nor Farr's response ("F**k that ni**er's gun") was an assertion, and those statements did not fall within the definition of hearsay. In contrast, Cosby's statement to Farr that Moody had a gun qualifies as hearsay. However, Cosby later testified that Moody "made it obvious" when he walked up to the group that he was armed, and that Cosby could see a pistol in the front of Moody's waistband. Any error in admitting Cosby's statement to Farr that Moody had a gun was harmless.

{¶ 93} Cosby also testified about statements he made to Moody. Cosby testified that he tried to diffuse the situation after the altercation. He led Moody away and said to Moody, "Let me see your weed, man." Cosby also told Moody, "Look, man, let that shit go. * * * It ain't worth hurting Jeff and it ain't worth you going to the penitentiary." None of these statements was offered for the truth of the matter, and they had no bearing on Moody's guilt.

{¶ 94} Finally, after the shooting, Cosby told a stranger at the store, "Jeff just got killed on the corner." Even if this statement were hearsay (and assuming that the statement did not fall within the exceptions for excited utterances and present sense impressions), the evidence at trial established that Farr was fatally shot, and this fact was not in dispute. Any error in the admission of this statement was harmless.

*C. Raymond Nicholson*

{¶ 95} Moody also challenges the admission of several statements by Nicholson during Nicholson's testimony about the shooting. Nicholson testified that he was seated next to Farr when Farr was shot, and that immediately after the shooting, Wilson told him,

"Move, Raymond, move, move, get up. * * * Jeff is laying right next to you." Moody objected to the testimony as to what Wilson had said to Nicholson, and the court overruled the objection. We find no abuse of discretion in the trial court's ruling, as these statements reasonably could fall under the excited utterance exception to the hearsay rule. Evid.R. 803(2).

{¶ 96} Nicholson also testified, without objection, that he told a responding police officer, "A guy walked right past us, he had on all black and pow, that's when heard [sic] the shots." Given that Nicholson's statement to the officer was made shortly after the shooting, Nicholson's statement could have qualified as an excited utterance, Evid.R. 803(2), or a present sense impression, Evid.R. 803(1). When asked why Nicholson did not identify Moody as the shooter at that time, Nicholson testified, "I'm telling you I was so scared. I was traumatized. I couldn't sleep for two days." These statements do not appear to be hearsay since he was not repeating a person's statements, but was merely explaining his actions. Regardless, even if Nicholson's testimony were inadmissible hearsay, the statements were not prejudicial to Moody. No one testified that Moody had been wearing all black on the day of the shooting; to the contrary, Alves testified that Moody had been wearing a blue shirt, dark blue capris jeans, and a two-tone blue hat.

{¶ 97} Finally, Nicholson testified that he heard Moody say to Farr, "I'm going to pay you your money" and "As soon as I sell the weed I'm going to pay you your money right then and there." Each of these statements was admissible as an admission of a party-opponent. Evid.R. 801(D)(2).

*D. Charles Dozier*

{¶ 98} During Dozier's testimony, Dozier stated without objection that he observed

the argument between Moody and Farr and that Cosby told Farr to "sit down, he got a gun." Dozier's testimony that he heard Cosby say that Moody had a gun may qualify as hearsay. However, given that numerous witnesses testified that they observed the altercation between Moody and Farr and that Moody subsequently shot Farr, Dozier's testimony as to Cosby's statement is harmless beyond a reasonable doubt.

{¶ 99} Moody takes issue with several additional statements that Dozier made to his sister following the shooting. Dozier testified that, immediately after the shooting, he told his sister "to get in the truck, let's go." Dozier's command to his sister was not an assertion, and it was not admitted for its truth (but merely that he said it). Even if Dozier's statement to his sister were an "assertion," it would reasonably have been admissible as an excited utterance.

{¶ 100} Dozier testified that he spoke to the police on several occasions, and that his initial statement to the police did not include information about driving Moody to an apartment several miles away. When asked by the prosecutor what made him come forward and tell the police the full story, Dozier responded that he told his sister, "I got to do the right thing. Jeff was a friend of mine, you know, we was drinking buddies." Dozier's statement was not offered for the truth of matter asserted; it was offered simply to explain why he decided to provide a fuller statement to the police.

*E. Cynthia Dozier*

{¶ 101} Cynthia Dozier also testified about statements that she and others made on the day of the shooting. During the altercation prior to the shooting, she heard Farr say to the young man (Moody) who had come into the lot, "If you don't have my m'f' money or my gun, don't come over here." Cynthia further testified that after Farr dropped the

stick, another man (who others identified as Cosby) grabbed Moody and said, "No, man." After the shooting, Charles Dozier told Cynthia, "Cindy, get in the truck. Get in the truck." Soon after, when Charles and Moody were getting into Charles's truck, Cynthia said, "Hold up. Wait for me."

{¶ 102} None of this testimony is inadmissible hearsay. None of the statements was offered for the truth of the matter, but rather that they were said.

*F. Zaneta White, Rhonda Alves, Detective Thomas Cope*

{¶ 103} Moody claims that the trial court permitted impermissible hearsay by White, Alves, and Cope. For the reasons stated above, White's and Alves's prior statements and Cope's testimony regarding prior inconsistent statements were admissible. We find no prejudicial error in White's, Alves's, and Detective Cope's testimony.

*G. Jeff Farr*

{¶ 104} Finally, Moody reiterates that several of Farr's statements, made prior to the shooting, were admitted. He claims that these statements should have been excluded, because they did not qualify as dying declarations. Each of Farr's statements has been addressed above, and we find no error in their admission.

{¶ 105} Moody's fourth assignment of error is overruled.

## VI. Prosecutorial Misconduct

{¶ 106} Moody's fifth assignment raises prosecutorial misconduct. He states that the prosecutor engaged in misconduct in seven respects:

- Without declaring the witnesses hostile, the State continuously and with multiple witness used leading questions on direct examination

- By introducing substantive and prejudicial evidence which otherwise would not have been made available through the guise of impeachment of Rhonda Alves and Zaneta White (and impeachment of Rhonda Alves by Detective Cope)

- By failing to disclose to defense counsel cruiser cam videos intended for trial until two days prior to the trial which were later improperly used as substantive and prejudicial evidence

- By instructing the jury as to whose testimony was credible and whose testimony was not credible in closing statements

- By instructing the jury * * * that all elements were met

- By using improper and inflammatory remarks in the rebuttal closing [argument] insinuating Defendant was lying and that defense counsel was taking them on detours in regards to evidence which was not favorable to the state

- By using a summation which asked that justice be extended even to [the apartment complex].

For the reasons set forth in other assignments of error, above, we reject the first, second, and third claims of prosecutorial misconduct.

**{¶ 107}** The test for prosecutorial misconduct is whether the prosecutor's remarks or questions were improper and, if so, whether they prejudicially affected substantial rights of the accused. *State v. Exon*, 2d Dist. Clark No. 2014-CA-106, 2016-Ohio-600, ¶ 40, citing *State v. Jones*, 90 Ohio St.3d 403, 420, 739 N.E.2d 300 (2000). A prosecutor's conduct during trial cannot be grounds for error unless the conduct deprives the

defendant of a fair trial. *State v. Williams*, 2d Dist. Montgomery No. 24548, 2012-Ohio-4179, ¶ 51, citing *State v. Apanovitch*, 33 Ohio St.3d 19, 24, 514 N.E.2d 394 (1987). The focus of the inquiry is on the fairness of the trial, not on the culpability of the prosecutor. *State v. Bey*, 85 Ohio St.3d 487, 496, 709 N.E.2d 484 (1999).

{¶ 108} Where it is clear beyond a reasonable doubt that the jury would have found the defendant guilty, even absent the alleged misconduct, the defendant has not been prejudiced, and his conviction will not be reversed. *See State v. Underwood*, 2d Dist. Montgomery No. 24186, 2011-Ohio-5418, ¶ 21. We review allegations of prosecutorial misconduct in the context of the entire trial. *State v. Stevenson*, 2d Dist. Greene No. 2007-CA-51, 2008-Ohio-2900, ¶ 42, citing *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).

{¶ 109} In general, prosecutors enjoy a wide degree of latitude during closing arguments. *State v. Whitfield*, 2d Dist. Montgomery No. 22432, 2009-Ohio-293, ¶ 12. They may freely address what the evidence has shown and what reasonable inferences may be drawn from that evidence. *State v. Lott*, 51 Ohio St.3d 160, 165, 555 N.E.2d 293 (1990); *State v. Black*, 181 Ohio App.3d 821, 2009-Ohio-1629, 911 N.E.2d 309, ¶ 33 (2d Dist.). "However, prosecutors must refrain from making misleading insinuations and assertions as well as expressing personal beliefs or opinions regarding the defendant's guilt. Prosecutors must also refrain from alluding to matters unsupported by admissible evidence. 'It is a prosecutor's duty in closing arguments to avoid efforts to obtain a conviction by going beyond the evidence which is before the jury.' " (Citations omitted.) *State v. Richmond*, 2d Dist. Greene No. 2005 CA 105, 2006-Ohio-4518, ¶ 15, quoting *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984).

{¶ 110} In addition, prosecutors may not make statements that are "so inflammatory as to render the jury's decision a product solely of passion and prejudice against the appellant." *State v. Williams*, 23 Ohio St.3d 16, 20, 490 N.E.2d 906 (1986). "Where it appears that prosecutorial comments constituted an invitation to the jury to go beyond the evidence or were so flagrant as to incite the passions or prejudice of the jury, and thereby deny the accused a fair trial, prejudicial error may inhere." *State v. Slagle*, 8th Dist. Cuyahoga No. 55759, 1990 WL 82138, * 9 (June 14, 1990), citing *State v. Price*, 60 Ohio St.2d 136, 140, 398 N.E.2d 772 (1979).

{¶ 111} Moody did not object to the prosecutor's closing or rebuttal argument. Accordingly, he has waived all but plain error.

{¶ 112} First, Moody claims that the prosecutor inappropriately vouched for the credibility of the State's witnesses.

{¶ 113} An attorney may not express a personal belief or opinion as to the credibility of a witness. *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, ¶ 117, citing *State v. Williams*, 79 Ohio St.3d 1, 12, 679 N.E.2d 646 (1997). "In order to vouch for the witness, the prosecutor must imply knowledge of facts outside the record or place the prosecutor's personal credibility in issue." *Id.*, citing *State v. Keene*, 81 Ohio St.3d 646, 666, 693 N.E.2d 246 (1998).

{¶ 114} In contrast, "[a] prosecutor may comment upon the circumstances of witnesses in their testimony, including their interest in the case, their demeanor, their peculiar opportunity to review the facts, their general intelligence, and their level of awareness as to what is going on. The prosecutor may conclude by arguing that these circumstances make the witnesses more or less believable and deserving of more or less

weight." (Citation omitted.) *State v. Clay*, 181 Ohio App.3d 563, 2009-Ohio-1235, 910 N.E.2d 14, ¶ 47 (8th Dist.), quoted by *State v. Jeffery*, 2013-Ohio-504, 986 N.E.2d 1093, ¶ 21 (2d Dist.).

**{¶ 115}** Moody cites the following statement by the prosecutor:

> * * * I told you how Jeffrey Farr was not alone at that lot. I told you how he was there with friends, acquaintances, people standing in close proximity to Jeffrey Farr. I told you how each of those witnesses would walk through those doors, how they'd take that stand and how they would tell you, *credibly tell you*, about the events that unfolded on July 17th, 2014 at [the lot]. The State delivered on that promise.

(Emphasis added.)

**{¶ 116}** The prosecutor then proceeded to discuss the testimonies of the State's witnesses. The prosecutor discussed what facts may be gleaned from the coroner's testimony regarding the wounds to Farr's body and summarized the testimonies of the eyewitnesses. The prosecutor repeatedly reminded the jurors that they were "the credibility judges of the witnesses" and that they would need to judge whether it was reasonable for various witnesses to have left the scene and for witnesses not to have come forward immediately after the shooting.

**{¶ 117}** Although the prosecutor stated that several witnesses testified "credibly," this part of his argument was immediately supported with references to the witnesses' testimony and the generally consistent story that the eyewitnesses and physical evidence provided. In short, the prosecutor's statements regarding the witnesses' credibility were supported by reference to the evidence presented, and not based on knowledge of facts

outside the record or the prosecutor's personal belief in the witnesses. We find no improper vouching by the prosecutor.

**{¶ 118}** Second, Moody claims that the prosecutor improperly made derogatory comments about defense counsel during rebuttal closing argument by referring to defense counsel's arguments as "detours." The prosecutor stated:

> You know, [the other prosecutor] has given you an excellent road map to follow in arriving at your verdict, and please, if you remember anything that we say here this morning, remember this. Follow the evidence. Follow the testimony because it's only when you follow the evidence that you will be able to arrive at a true and just verdict.
>
> Don't be caught going down detours. What do I mean by that? Don't let yourselves be talked into going down a detour that the Defense suggests to you that is of no consequence to the case, that is nonsensical in nature. Stay true to the path and follow the evidence.
>
> What do I mean by detours that are of no real consequence? Things like no DNA found at the scene that matches back to the Defendant; things like no fingerprints were found, things like there was not a description of the gun that was given specifically by the witnesses; things like different dates of statements. Those are just some examples of what I mean by detours, and we'll talk about it.
>
> Let me just say this. These detours will lead you to a dead end and it's only upon following the evidence and staying on the path that you will be able to reach a just true word. [sic.]

What are some examples of other types of detours? Well, you all as the jurors are the arbiters of the fact. You decide the facts of the case. You will have to use your collective recollection when it comes to what the testimony was from each of the individual witnesses. And Defense Counsel made some statements up here as to what he said the witnesses testified to, and I made some notes because I just don't recall that being the fact or the case as to what these people testified to, and I will give you some examples. But you all will be the ones that have to decide based on your recollections.

The prosecutor next discussed portions of different witnesses' testimony that the prosecutor said defense counsel had misreported. The prosecutor then argued that the factual circumstances of this case did not lend themselves to having DNA evidence or fingermark evidence.

{¶ 119} We find nothing in the prosecutor's remarks that rendered Moody's trial unfair. Although the prosecutor was critical of defense counsel's argument (as opposed to defense counsel personally), the prosecutor merely argued to the jury why defense counsel's argument should not be persuasive, why the absence of certain evidence was irrelevant to the case before them, and why the testimony of the witnesses, which implicated Moody, should be credited and given primary consideration. The prosecutor's characterization of defense counsel's arguments as "detours" was not unfairly prejudicial.

{¶ 120} Moody further cites as misconduct the prosecutor's statements that Moody "should not be rewarded" for the absence of DNA and fingermark evidence and the absence of the murder weapon itself. Viewed in the context of all of the closing

arguments, we do not agree that this is misconduct.

{¶ 121} Defense counsel's closing argument focused on the lack of an investigation and the lack of physical evidence. Defense counsel noted that only Farr's DNA was found at the scene, there were no cell phone records, there were no fingerprints, and there was no video recording of the incident. In asking the jury not to "reward" Moody for the lack of physical evidence, the prosecutor was emphasizing that the jury should consider the evidence before it, and that absence of certain evidence did not warrant an acquittal. This was within the scope of reasonable argument.

{¶ 122} Moody further contends that the prosecutor played to the emotions of the jury by commenting that Farr "is no longer with us and we can't hear from him." The prosecutor told the jury that Farr nevertheless spoke to them through his lack of defensive wounds (no physical altercation when shot), the location of his entrance wounds (shot from behind), the angle of the bullets (sitting down when shot), and the injuries caused by the bullets (couldn't move after his spine was severed and died quickly). The fact that Farr was deceased and could not testify was proven and not disputed. The prosecutor's statements were reasonable comments on the evidence presented by the coroner, and they asserted that the evidence from Farr's body substantiated the eyewitness testimony about what had occurred in the lot.

{¶ 123} Moody next points to statements by the prosecutor in rebuttal that "I guess they want you to think this is a conspiracy." The prosecutor continued:

Everybody is lying except for the Defendant and they are somehow getting their stories together. In order to believe that, you would have to believe that Raymond Nicholson and Stanley Wilson and Gary Cosby and Charles

Dozier somehow collaborated with [the coroner] with regard to the medical science. You have to ask yourself do you believe that? It's ridiculous.

You know, we heard a lot of criticism about the witnesses in this case and something needs to be said about that because this defendant is the one that picked the witnesses. He chose those witnesses when he decided to gun down Jeffrey Farr in broad daylight in that dirt parking lot. Everyone that was there at that point became a witness in his case. He chose them. And now he wants to criticize them? To make fun of them because they were afraid to go to the police right away?

To make you think they're liars because they didn't want to become involved in a murder case? Witness after witness told you the reasons why they delayed telling the police what they saw. If they had their preference, they wouldn't have been sitting up here. They didn't want to become involved. Whether it was because of the neighborhood, whether it was because of fear, being labeled as a snitch – all of those. They told you.

{¶ 124} Again, these statements were in response to defense counsel's argument regarding the eyewitness evidence. Defense counsel had argued that six witnesses claimed to be at the scene, but none had "ever described what the shooter was wearing or given any description of the gun they now claim to have seen." Defense counsel emphasized that none of the witnesses had come forward and identified Moody as the shooter on the day of the shooting. Counsel noted that Nicholson, who later identified Moody in a photo spread, had originally told officers that the shooter was wearing all black and a mask. Defense counsel asked the jury, "Why the lies?" Viewing the transcript as

a whole, we find the prosecutor's statements to be proper rebuttal argument.

{¶ 125} Finally, Moody claims that the prosecutor improperly appealed to the jury's emotions when he argued: "But thank goodness for Walter Jackson, and thank goodness for Raymond Nicholson, and Stanley Wilson because they did do the right thing. And because of that, we know the truth about what happened. And because they're brave enough to come in here, *justice can extend out to [the apartment complex]*." (Emphasis added.) Defense counsel did not object.

{¶ 126} "A prosecutor may legitimately call for justice or ask jurors to do their duty. However, a prosecutor may not ask a jury to punish a particular defendant for all of the crimes committed in the community." (Citation omitted.) *State v. Jefferson*, 2d Dist. Greene No. 2002 CA 26, 2002-Ohio-6377, ¶ 18. To the extent that the prosecutor suggested that a guilty verdict would provide justice for the larger community (the apartment complex), we do not find this isolated remark was prejudicial, let alone rises to the level of plain error, when viewed in the context of the entire trial.

{¶ 127} Moody's fifth assignment of error is overruled.

### VII. Cumulative Error

{¶ 128} In his sixth assignment of error, Moody claims that all of the alleged errors at trial cumulatively resulted in prejudicial error, warranting a reversal of his conviction and a new trial.

{¶ 129} The cumulative error doctrine provides that a conviction may be reversed "where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial[,] even though each of numerous instances of trial court error does not individually constitute cause for reversal." *State v. Garner*, 74 Ohio St.3d 49, 64, 656

N.E.2d 623 (1995). The doctrine of cumulative error does not apply in this case because Moody has not established multiple instances of harmless error. *See id.*

{¶ **130**} Moody's sixth assignment of error is overruled.

### VIII. Conclusion

{¶ **131**} The trial court's judgment will be affirmed.

. . . . . . . . . . . . .

FAIN, J. and HALL, J., concur.

Copies mailed to:

Andrew T. French
Jennifer S. Delaplane
Hon. Barbara P. Gorman