[Cite as *State v. Fails*, 2025-Ohio-4680.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY

| | |
|---|---|
| STATE OF OHIO | : |
| | :   C.A. No. 2024-CA-70 |
|     Appellee | : |
| | :   Trial Court Case No. 24-CR-529 |
| v. | : |
| | :   (Criminal Appeal from Common Pleas |
| PAUL WILLIAM FAILS | :   Court) |
| | : |
|     Appellant | :   **FINAL JUDGMENT ENTRY &** |
| | :   **OPINION** |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on October 10, 2025, the judgment of the trial court is affirmed in part as modified, reversed in part, and remanded.

Costs to be paid as follows: 50% by the Appellant and 50% by the Appellee.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

_____
RONALD C. LEWIS, JUDGE

EPLEY, P.J., and TUCKER, J., concur.

**OPINION**

CLARK C.A. No. 2024-CA-70

JENNIFER E. MARIETTA, Attorney for Appellant
CHRISTOPHER P. LANESE, Attorney for Appellee

LEWIS, J.

{¶ 1} Defendant-Appellant Paul William Fails appeals from his conviction for failure to comply with an order or signal of a police officer in the Clark County Common Pleas Court following a jury trial. For the following reasons, the judgment of the trial court is affirmed in part as modified, reversed in part, and remanded for resentencing.

## I. Facts and Procedural History

{¶ 2} On July 15, 2024, Fails was indicted by a Clark County grand jury on one count of failure to comply with an order or signal of a police officer, in violation of R.C. 2921.331(B). The charge included the additional element that the operation of the motor vehicle by Fails caused a substantial risk of serious physical harm to persons or property, which elevated the offense from a first-degree misdemeanor to a felony of the third degree.[1] The case proceeded to a jury trial in September 2024. The following evidence was adduced at trial.

{¶ 3} Kari McOwen testified that she was working as a shift supervisor at the CVS on Upper Valley Pike on July 4, 2024. The store was open to the public that day. Around 5:00 p.m. that evening, McOwen observed a man, later identified as Fails, enter the store six or seven times and take pictures with his phone. He claimed that someone was paying him to take the pictures. McOwen testified that Fails was staggering and not standing up straight.

---

[1] At the time of the offense, a violation of R.C. 2921.331(B) was generally charged as a first-degree misdemeanor. However, effective October 24, 2024, the statute was amended to increase a violation of R.C. 2921.331(B) to a felony of the fourth degree.

2

{¶ 4} Around the sixth time Fails entered the store, McOwen told him that, if he was not a CVS employee or a vendor for CVS, he would need to leave. The next time Fails came in, McOwen called the non-emergency police number. An officer for the German Township Police Department responded to the CVS.

{¶ 5} Once the officer was inside the store, Fails saw the officer, which caused him to leave the store. The officer requested surveillance footage of Fails, which McOwen displayed for him. She also provided a written statement. On cross-examination, McOwen reviewed her written statement in which she stated that Fails came into the store that day two or three times before she asked him to leave.

{¶ 6} Thaddeus Conley, a German Township police officer for less than two years, testified he was dispatched to the CVS located at 1493 Upper Valley Pike on July 4, 2024, in reference to an individual who had been asked to leave but had not. Officer Conley wore his police uniform and drove a marked police cruiser to the CVS, but he did not turn on his overhead lights or siren. When he arrived, he spoke with McOwen who pointed out Fails as Fails walked out of the store. Officer Conley went to make contact with Fails as Fails was backing out of a parking spot. Officer Conley yelled out to Fails, who acknowledged Officer Conley by rolling down the driver's side window and looking at him. Officer Conley then asked Fails "hey, can you just park real quick. I need to have a word with you." Trial Tr. 186. Fails nodded in response but did not park his car. Instead, Fails "slow rolled" his vehicle in the parking lot past several open parking spaces so Officer Conley yelled to him again "hey, can you park the car?" *Id*. at 187. Fails responded that he was but instead turned and drove toward the exit of the parking lot that intersected with Upper Valley Pike. Before Fails reached the exit, a large truck came through the intersection and entered the parking lot exit lanes. The truck pulled into the wrong lane directly in front of Fails and

3

stopped. Fails veered to the left at an angle and came to a stop just in front of the stopped truck.

**{¶ 7}** Officer Conley ran up to Fails's car, opened the driver's side door, and ordered Fails to put his hands on the wheel where he could see them. Because Fails had moved around a lot in the vehicle and failed to immediately stop, Officer Conley had his gun out as he opened the driver's side door. Fails threw his hands up and tried to debate with Officer Conley regarding what he was doing inside the CVS. Officer Conley gave a second command to Fails to put his hands on the steering wheel. Fails put his hands on the steering wheel for a couple seconds, then placed the car in drive and sped off. According to Officer Conley, the tires on Fails's vehicle squealed when he drove away. *Id*. at 231. Officer Conley described Fails driving away as "very – very fast and reckless" and Fails had to dodge the truck that had been blocking him. *Id*. at 191. Fails also broke the plane of a double-yellow line in the exit lanes to get around the truck. When Fails drove off, Officer Conley had been one to two feet away from the car with the driver's side door open. Conley was not hit by Fails's car and either stood still or maybe took a step back as the car drove off. Fails did not hit the truck in front of him but went left to get around the truck, which was in the same direction as where Officer Conley was standing. Once Fails got around the truck, he "sped off pretty quick." *Id*. at 192.

**{¶ 8}** Officer Conley saw Fails turn right at the intersection and drive southbound on Upper Valley Pike toward Troy Road, a.k.a. State Route 41, at a high rate of speed until Fails's vehicle was no longer visible. Officer Conley could see that Fails drove through the next intersection, but he could not see whether Fails ran any red lights. Officer Conley radioed dispatch that the vehicle had fled from him. He did not get into his police cruiser and chase Fails as his department did not have a pursuit policy. Instead, he returned to

4

the CVS store to speak with McOwen. Officer Conley requested surveillance video, had McOwen write a statement, and obtained additional details about Fails having been in the store the night before.

{¶ 9} Officer Conley was able to get Fails's license plate and obtained a picture of Fails's vehicle. He learned the home address and owner of the vehicle based on the license plate. At some point later that day, Officer Conley and two Clark County Sheriff's Office deputies went to the address, which turned out to be Fails's father's residence, where they arrested Fails. The vehicle Fails had driven was parked in the driveway. There was a tarp on the ground in front of it that appeared as though it had fallen off the vehicle. Fails was *Mirandized* and questioned by Officer Conley. Fails made admissions that he was at the CVS and fled because he was scared.

{¶ 10} Officer Conley testified that he was wearing a body-worn camera during the investigation, and his police cruiser had dash camera video. Both videos were submitted as evidence at trial.

{¶ 11} Anthony Reynolds, a Clark County Sheriff's Office deputy for less than two years, testified that he was working on July 4, 2024. Around 5:00 p.m. that evening, Deputy Reynolds was driving down Shrine Road, which dead-ends into Upper Valley Pike and is two or three intersections south of the CVS intersection on Upper Valley Pike. Deputy Reynolds received information that a German Township police officer was dispatched to a trespassing complaint and, shortly thereafter, a white Toyota four-door vehicle fled from the officer. Deputy Reynolds picked up his pace to get closer to the area. As Deputy Reynolds approached the intersection of Upper Valley Pike, he observed a white four-door vehicle heading southbound, so he assumed it was "probably that car." Trial Tr. 237. The vehicle was driving "very, very quickly," but Deputy Reynolds did not observe the vehicle committing

5

any other traffic violations. *Id*. at 237-238. Deputy Reynolds estimated that the vehicle was driving faster than the posted speed limit of 45 miles per hour but did not get a measurement or give an estimate as to what speed he thought the car was going. Deputy Reynolds turned southbound at Upper Valley Pike in the direction of State Route 40 to look for the car, but he did not turn his police lights or siren on or initiate a pursuit because he "didn't have a reason to." *Id*. at 241.

{¶ 12} Deputy Reynolds stated that in his experience, around that time of day in the Upper Valley Pike area, the vehicle traffic levels are pretty heavy, but not so much with pedestrian traffic. There may have been a little less traffic than normal on July 4, 2024, because of the holiday, but there was still "a pretty good amount of traffic." *Id*. at 240.

{¶ 13} After Deputy Reynolds was unable to locate the car, he obtained information from dispatch about the address associated with the license plate of the vehicle. He drove to the address and saw a white sedan parked halfway under a black tarp that appeared to be the same vehicle. Deputy Reynolds contacted Officer Conley, who then responded to the residence where they arrested Fails.

{¶ 14} Following the completion of the State's case-in-chief, Fails moved for a Crim.R. 29 acquittal, which was denied. Fails did not present any witnesses. The jury found Fails guilty of failure to comply with an order or signal of a police officer. The jury further found that the State proved beyond a reasonable doubt that Fails's operation of the motor vehicle caused a substantial risk of serious physical harm to persons or property.

{¶ 15} On October 4, 2024, the trial court imposed a sentence of 15 months in prison, which was ordered to run consecutive to Fails's prison sentence resulting from a conviction in a case out of Champaign County. The trial court also imposed a driver's license suspension for five years and court costs. Fails timely appealed.

6

## II. Hearsay

{¶ 16} Fails raises six assignments of error on appeal. His first assignment of error states as follows:

The court erred by permitting the jury to hear multiple instances of inadmissible hearsay, despite cautionary and limiting instructions.

{¶ 17} Fails objected to multiple instances of alleged hearsay throughout trial and claims that the jury was prejudiced by the cumulative effect of all the hearsay evidence that was admitted. Fails does not specifically identify each of the instances in the record of which he complains but generically states that during trial "the Jury was repeatedly permitted to hear hearsay evidence that would otherwise have been inadmissible." Appellant's Brief, p. 15. Despite his lack of specificity, it appears Fails challenges statements recorded on Officer Conley's cruiser videos (State's Exhibits 1 and 2) and body-worn camera (State's Exhibits 3 and 4) that were made by individuals other than Officer Conley or Fails. These videos were shown to the jury during Officer Conley's testimony. These objections fall into three categories: (1) statements by McOwen in State's Exhibit 3, (2) statements by dispatch on the radio in Officer Conley's cruiser on State's Exhibit 2, and (3) statements made by Fails's father and/or Deputy Reynolds on State's Exhibit 4.

{¶ 18} "The trial court has broad discretion in the admission and exclusion of evidence and unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby, [a reviewing court] should be slow to interfere." *State v. Hymore*, 9 Ohio St.2d 122, 128 (1967). "A trial court abuses its discretion when it acts in an unreasonable, arbitrary or unconscionable manner." *State v. Finnerty*, 45 Ohio St.3d 104, 107 (1989).

{¶ 19} Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter

7

asserted in the statement." Evid.R. 801(C). A "statement" is an oral or written assertion or nonverbal conduct of a person if that conduct is intended by the person as an assertion. Evid.R. 801(A). Generally, hearsay is not admissible pursuant to Evid.R. 802. "If a statement is not offered for the truth of the matter asserted, however, it is not prohibited by the hearsay rule and will be admissible, subject to the standards governing relevancy and undue prejudice." *State v. Maxwell*, 2014-Ohio-1019, ¶ 129, citing Evid.R. 402 and 403. "It is well established that extrajudicial statements made by an out-of-court declarant are properly admissible to explain the actions of a witness to whom the statement was directed." *State v. Thomas*, 61 Ohio St.2d 223, 232 (1980).

{¶ 20} During Officer Conley's testimony, the State played his body-camera video, which included McOwen's conversation with Officer Conley at the CVS. State's Exhibit 3. In the video, McOwen reiterated the conduct that had precipitated her calling the police and pointed out Fails, who was still inside the store, to Officer Conley. After Fails fled, Officer Conley returned to the store and had additional conversation with McOwen discussing Fails, obtaining surveillance video, and recounting the preceding events in the parking lot. By the time the jury watched the body camera footage of Officer Conley's discussion with McOwen, both had already testified about their conversation and the events that had transpired. The jury had also watched the events that unfolded outside the store. Contemporaneously with the playing of the video, the trial court provided an instruction to the jury that the statements of McOwen on the video were to provide context for what Officer Conley was doing and were not to be considered for the truth of the matter asserted. The court further instructed the jury that only the statements made by McOwen while she was testifying on the witness stand should be considered as evidence.

{¶ 21} Even if statements of a declarant are construed as hearsay, "[t]he admission

8

of hearsay is harmless error where the declarant was also a witness and examined regarding matters identical to those contained in the hearsay statements." *State v. Smith*, 2006-Ohio-45, ¶ 16 (2d Dist.), citing *State v. Allen*, 1996 WL 280745 (2d Dist. May 24, 1996). Because the statements by McOwen in the body camera video were cumulative to the testimony she provided in open court, where she was cross-examined on the same matters, we cannot conclude that the trial court abused its discretion in admitting this portion of the video or that there was any discernible prejudice to Fails resulting therefrom.

{¶ 22} When Officer Conley's cruiser video was played for the jury during his testimony, defense counsel objected to the statements made by the dispatcher over the radio. State's Exhibit 2. Fails again does not identify what statements were hearsay or how any statements prejudiced him. The only relevant statements made by the dispatcher were those providing the license plate and description of Fails's vehicle. By the time the dispatcher provided that information, Officer Conley had already given a description of Fails's vehicle, and the vehicle had already been observed on the cruiser video. Nevertheless, the trial court provided an instruction that the jury should not consider the statements of the dispatcher as evidence. Additionally, Fails's license plate was clearly visible in Officer Conley's body camera video, which was admitted as evidence and shown to the jury.

{¶ 23} We find no abuse of discretion in the trial court's admission of this evidence. The State did not offer the statements of the dispatcher for the truth of the matter asserted and, therefore, they do not qualify as hearsay. Moreover, even if we assume there was error in admitting this evidence, we conclude any error is harmless as this evidence was either cumulative of other evidence admitted at trial or had no bearing on the outcome of the trial.

9

{¶ 24} As to the video recording at Fails's father's residence, it appears that the State submitted a redacted version of the video as State's Exhibit 4 due to a sustained objection after previously playing a fuller, unredacted version to the jury. The redacted video portrayed Officer Conley receiving permission from Fails's father to check the vehicle on his property, which Fails was suspected to have driven, and Officer Conley verifying it was the same vehicle. The video then skipped ahead to Fails in the back of the police cruiser where he was *Mirandized* and questioned. No statements can be heard from Deputy Reynolds in the video.

{¶ 25} Based on the record before us, we see no error in the trial court's admission of State's Exhibit 4. The admission of the consent to search was not offered for the truth of the matter asserted. If anything, it could be admissible to prove that the declarant made it, i.e., that the officers had permission to look at the car. *State v. Williams*, 38 Ohio St.3d 346, 348 (1988) ("A statement is not hearsay if it is admitted to prove that the declarant made it, rather than to prove the truth of its contents"). Moreover, the trial court gave limiting instructions to the jurors. We see no abuse of discretion in admitting State's Exhibit 4.

{¶ 26} To the extent additional footage was shown to the jury beyond what is in the redacted video, we are unable to review it as it is not part of the record. Nor has Fails identified what was objectionable on the unredacted video or how it prejudiced him. Based on the record before us we cannot ascertain any prejudice. The transcript reflects that defense counsel objected to statements made by Deputy Reynolds on the video recording, in particular with regard to the tarp. The trial court provided limiting instructions to the jury. Deputy Reynolds was the next witness to testify after Officer Conley. Both the State and the defense had the opportunity to ask about any statements Deputy Reynolds made. Because the evidence was cumulative and the declarant testified at trial subject to cross-

10

examination about the same evidence, any alleged error in allowing the jury to see the unredacted video was harmless.

{¶ 27} Fails's first assignment of error is overruled.

### III. Manifest Weight and Sufficiency

{¶ 28} Because our resolution of the third and fourth assignments of error affect Fails's second assignment of error, we will consider these assignments of error before the second assignment of error. In his third assignment of error, Fails argues that his conviction is not based on sufficient evidence. In his fourth assignment of error, Fails contends that his conviction is against the manifest weight of the evidence. Fails contends that the officer did not have a lawful basis to stop him and, further, his operation of a motor vehicle did not cause a substantial risk of serious physical harm to persons or property.

{¶ 29} "Whether the evidence is legally sufficient to sustain a conviction is a question of law that this court reviews de novo." *State v. Brown*, 2025-Ohio-2804, ¶ 16, citing *State v. Groce*, 2020-Ohio-6671, ¶ 7. A sufficiency-of-the-evidence argument challenges whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or to sustain the verdict as a matter of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). "To resolve a sufficiency challenge, we must determine 'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. McKelton*, 2016-Ohio-5735, ¶ 325, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. An appellate court does not engage in a determination of the witnesses' credibility when reviewing the sufficiency of the evidence. *State v. Goff*, 82 Ohio St.3d 123, 139 (1998), citing *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. Nor does an appellate court assess

11

whether the evidence admitted at trial is to be believed, but whether, if believed, the evidence would convince the average mind of the defendant's guilt beyond a reasonable doubt. *Jenks* at paragraph two of the syllabus. "We will not disturb the verdict unless we find that reasonable minds could not reach the conclusion reached by the trier of fact." *State v. Treesh*, 90 Ohio St.3d 460, 484 (2001), citing *Jenks* at 273.

{¶ 30} In contrast to a sufficiency challenge, the weight of the evidence concerns the inclination of the greater amount of credible evidence offered to support one side of the issue rather than the other. *Thompkins*, 78 Ohio St.3d at 387. "To evaluate a manifest-weight claim, we must review the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of all the witnesses." *McKelton* at ¶ 328, citing *Thompkins* at 387. A case should be reversed as being against the manifest weight of the evidence only "'in the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

{¶ 31} Sufficiency and manifest weight of the evidence are both quantitatively and qualitatively different legal concepts. *Thompkins* at paragraph two of the syllabus. A conclusion that a conviction is not against the manifest weight of the evidence, however, necessarily includes a determination that the conviction is based on sufficient evidence. *State v. McCrary*, 2011-Ohio-3161, ¶ 11 (10th Dist.). On the other hand, "[w]here there is insufficient evidence to support a conviction, it will also necessarily be against the manifest weight of the evidence." *State v. Short*, 2017-Ohio-7200, ¶ 22 (2d Dist.).

{¶ 32} Fails was convicted of failure to comply with an order or signal of a police officer, in violation of R.C. 2921.331(B). Pursuant to that statute, the State was required to prove that Fails was operating "a motor vehicle so as willfully to elude or flee a police officer after receiving a visible or audible signal from a police officer to bring the person's motor

12

vehicle to a stop." The underlying offense is a misdemeanor of the first degree. R.C. 2921.331(C)(3). However, Fails was also charged with the additional element under R.C. 2921.331(C)(5)(a)(ii), that "[t]he operation of the motor vehicle by the offender caused a substantial risk of serious physical harm to persons or property." The additional element statutorily enhanced the offense from a misdemeanor to a third-degree felony. *State v. Fairbanks*, 2008-Ohio-1470, ¶ 7, citing R.C. 2921.331(C)(5)(a).

{¶ 33} A "substantial risk" is defined as "a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist." R.C. 2901.01(A)(8). "Serious physical harm to persons" includes any of the following:

(a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;

(b) Any physical harm that carries a substantial risk of death;

(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;

(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;

(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

R.C. 2901.01(A)(5).

{¶ 34} "Serious physical harm to property" means any physical harm to property that does either of the following:

(a) Results in substantial loss to the value of the property or requires a

13

substantial amount of time, effort, or money to repair or replace;

(b) Temporarily prevents the use or enjoyment of the property or substantially interferes with its use or enjoyment for an extended period of time.

R.C. 2901.01(A)(6).

{¶ 35} Fails first argues that Officer Conley lacked reasonable articulable suspicion to order Fails to stop and therefore his conviction is not supported by sufficient evidence and is against the manifest weight of the evidence. Crim.R. 12(C) provides that "[p]rior to trial, any party may raise by motion any defense, objection, evidentiary issue, or request that is capable of determination without the trial of the general issue." "Crim. R. 12(C)(3) provides that a motion to suppress evidence is a motion that must be raised prior to trial." *State v. Garrett*, 2005-Ohio-4832, ¶ 13 (2d Dist.). The failure to raise defenses or objections or to make requests which must be made prior to trial, at the time set by the court, constitutes waiver. Crim.R. 12(H); *State v. F.O.E. Aerie 2295 Port Clinton*, 38 Ohio St.3d 53, 54 (1988). *See also State v. Moody*, 55 Ohio St.2d 64, 66 (1978) ("Clearly, by failing to timely file his motion to suppress before trial, the appellant waived any error").

{¶ 36} Fails did not file a motion to suppress in the trial court. Fails' failure to raise the constitutional challenge in the trial court deprived the State of the opportunity to oppose that contention and develop a record that could be reviewed on appeal. *State v. Harrison*, 2021-Ohio-4465, ¶ 16. Accordingly, Fails waived any argument concerning the lawfulness of his stop by Officer Conley and cannot circumvent that waiver under the guise of a sufficiency or manifest weight analysis.

{¶ 37} Fails next argues that his conviction is against the manifest weight and sufficiency of the evidence because the evidence fails to demonstrate that his operation of the motor vehicle caused a substantial risk of serious physical harm to persons or property.

14

According to the State, the jury heard evidence that Fails fled the scene while squealing his tires, passed the truck that was blocking his path, crossed a double-yellow line, and drove off at a high rate of speed, thus creating a substantial risk of serious physical harm to persons or property.

{¶ 38} While we agree with the State that there was overwhelming evidence that Fails failed to comply with an order or signal of a police officer, we do not agree that sufficient evidence was presented to establish that Fails's driving created a substantial risk of serious physical harm to persons or property. While it is true the statute under which Fails was charged does not require actual serious physical harm to persons or property, it does require a "substantial risk" of serious physical harm to persons or property. R.C. 2921.331(C)(5)(a)(ii); *State v. Eldridge*, 2023-Ohio-3998, ¶ 48 (2d Dist.). As noted above, a "substantial risk" is defined as "a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist." R.C. 2901.01(A)(8).

{¶ 39} The evidence at trial established that Officer Conley verbally instructed Fails to park his car, which Fails acknowledged. Fails, however, did not comply and continued to "slow roll" through the parking lot toward the intersection to exit the parking lot. Officer Conley gave a second audible command to park the car to which Fails responded that he would but again did not. As Fails slowly approached the intersection of the parking lot drive and Upper Valley Pike, a white truck pulled directly in front of Fails, blocking his exit. Of the three lanes exiting the parking lot (left turn, straight, and right turn lanes), the white truck was stopped in both the straight and right turn lanes, thus being in the wrong lane of travel and blocking Fails's ability to leave in the appropriate lane of travel. Fails turned his car slightly to the left and stopped at an angle in the straight lane, presumably to avoid hitting

15

the truck. Officer Conley then approached Fails's vehicle, opened the driver's side door, and ordered Fails at gunpoint to place his hands on the wheel.

{¶ 40} Fails initially argued with Officer Conley about what happened in the CVS but then placed his hands on the wheel when ordered to do so again. Seconds later, Fails drove off, slightly to the left, to get around the white truck that was blocking him. Officer Conley was standing one to two feet away from Fails when Fails drove off. Officer Conley stood in place or, maybe, took a step back from Fails's vehicle as it took off. The vehicle did not hit Officer Conley or hit the white truck. Officer Conley never testified that the vehicle almost struck him or the white truck. According to Officer Conley, the wheels of Fails's vehicle broke the plane of a double-yellow line in the parking lot exit when Fails went to get around the truck and made a right hand turn onto southbound Upper Valley Pike. Officer Conley did not testify that this was a traffic violation. Notably, the relevant intersection was Upper Valley Pike and Federated Drive, but the Federated Drive designation did not apply to where Fails was located, only to the other side of the road that led to other businesses. When Fails turned right at the intersection, he had a green light. The northbound and southbound traffic already on Upper Valley Pike were stopped at the red light. No other vehicles were behind Fails or on Federated Drive when he drove off.

{¶ 41} According to Officer Conley, he heard Fails's tires squeal and saw Fails drive off "very – very fast and reckless." Trial Tr. 191. Officer Conley did not describe how Fails drove recklessly or how fast Fails travelled. Officer Conley testified that the speed limit on Upper Valley Pike was 35 miles per hour, but he did not testify how fast he estimated Fails was driving or that he believed Fails was driving over the speed limit. Officer Conley lost sight of Fails after Fails drove straight through the next intersection, but Officer Conley did not observe Fails run a red light and Officer Conley did not testify to any other improper

16

driving committed by Fails. When Officer Conley interviewed Fails later, Fails admitted that he fled from Officer Conley because he was scared.

{¶ 42} Deputy Reynolds testified that he was driving on Shrine Road, which dead-ends into Upper Valley Pike and was two or three intersections south of the CVS intersection on Upper Valley Pike. As Deputy Reynolds approached the intersection of Shrine Road and Upper Valley Pike, he observed a vehicle matching the description of Fails's vehicle heading southbound driving "very, very quickly." *Id*. at 237. Deputy Reynolds, an officer with two years of road patrol experience, stated that the vehicle was driving faster than the posted speed limit of 45 miles per hour, but did not get an actual measurement. Nor did he estimate how fast he thought the vehicle was travelling. While excessive speed may be a factor in determining whether a suspect's driving caused a substantial risk of serious physical harm to persons or property, there was no testimony as to how much over the speed limit Deputy Reynolds believed the vehicle was traveling or how he arrived at his opinion that the vehicle was exceeding the speed limit. *See State v. Monnin*, 2017-Ohio-1095, ¶ 27 (12th Dist.) (taking into account appellant's excessive rate of speed – travelling more than 46 miles per hour above the posted speed limit – when analyzing sufficiency of the evidence for substantial risk of serious physical harm to persons or property). Deputy Reynolds did not observe any other potential traffic violations.

{¶ 43} Deputy Reynolds stated there may have been a little less vehicle traffic than normal that day because of the holiday but testified there was "a pretty good amount of traffic." Trial Tr. 240. He also indicated that the area did not normally have pedestrian traffic. After Deputy Reynolds turned southbound onto Upper Valley Pike to look for the car, he did not turn his police overhead lights or siren on or initiate a pursuit because he "didn't have a reason to." *Id*. at 241.

17

{¶ 44} Video recordings from the incident show that there were no other passengers in Fails's vehicle. The encounter occurred just before 5:00 p.m. on July 4, 2024, and it was dry and cloudy outside. Fails fled from Officer Conley on southbound Upper Valley Pike, a four-lane divided roadway, in a commercial area with no pedestrians visible and not a significant amount of traffic. Besides the white truck that did a U-turn to follow Fails, no other vehicles drove southbound on Upper Valley Pike for approximately 45 seconds after Fails turned onto the road.

{¶ 45} Although there was testimony that the officers located Fails and the suspect vehicle, there was no evidence presented as to where that location was or how much time had elapsed between the incident and the arrest. Moreover, no officers engaged in a pursuit of Fails's vehicle.

{¶ 46} Having reviewed all the evidence, including the video recordings, in the light most favorable to the prosecution, we conclude that the State presented sufficient evidence of the underlying offense of failure to comply with an order or signal of a police officer. We further conclude that the conviction on the underlying offense was not against the manifest weight of the evidence. However, we cannot conclude that any rational trier of fact could have found beyond a reasonable doubt that Fails caused a substantial risk of serious physical harm to persons or property by the operation of his motor vehicle. Therefore, there was insufficient evidence to convict Fails of a third-degree felony version of the offense and we will modify his conviction to a first-degree misdemeanor violation of R.C. 2921.331(B). Because there is insufficient evidence of the enhancement element, it necessarily is also against the manifest weight of the evidence.

{¶ 47} Fails's third and fourth assignments of error are sustained in part and overruled in part.

18

## IV.     Second Assignment of Error

**{¶ 48}** In his second assignment of error, Fails raises the following argument:

Prosecutorial misconduct negatively impacted Mr. Fails' substantial right to a fair trial.

**{¶ 49}** Fails's second assignment of error is directed to the prosecutor's closing argument, which he contends referenced several facts not in evidence, mischaracterized evidence, and injected personal opinions.   Specifically, Fails points to the prosecutor's statements about the "good Samaritan" truck driver, personal statements of the prosecutor, and displaying a map not submitted as evidence with additional commentary about other facts not in evidence.

**{¶ 50}** Prosecutors are entitled to wide latitude during closing arguments as to what the evidence has shown and what reasonable inferences may be drawn therefrom, but it is not unlimited.   *State v. Lott*, 51 Ohio St.3d 160, 165-166 (1990).   "The test regarding prosecutorial misconduct in closing arguments is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant."   *State v. Smith*, 14 Ohio St.3d 13, 14 (1984), citing *United States v. Dorr*, 636 F.2d 117, 120 (5th Cir. 1981). "The touchstone of the analysis 'is the fairness of the trial, not the culpability of the prosecutor.'"   *State v. Leonard*, 2004-Ohio-6235, ¶ 155, quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982).   "Where it is clear beyond a reasonable doubt that the jury would have found the defendant guilty, even absent the alleged misconduct, the defendant has not been prejudiced, and his conviction will not be reversed."   *State v. Goldblum*, 2014-Ohio-5068, ¶ 44 (2d Dist.), citing *State v. Underwood*, 2011-Ohio-5418, ¶ 21 (2d Dist.).

**{¶ 51}** At trial, Fails objected to the prosecutor's argument about a good Samaritan and statements involving the prosecutor's personal life.   However, he did not object to any

other portions of the prosecutor's closing argument. Where a defendant fails to object to various aspects of the prosecution's closing argument, they have forfeited all but plain-error review of those claims. *State v. McAlpin*, 2022-Ohio-1567, ¶ 157. Plain error can be found where there is a deviation from a legal rule, which was an obvious defect in the trial proceedings, and the deviation affected the outcome of the trial. *State v. Morgan*, 2017-Ohio-7565, ¶ 36; *State v. Mays*, 2024-Ohio-4616, ¶ 27. Notice of plain error is "to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

### a. Good Samaritan

{¶ 52} During Officer Conley's direct examination, the State had attempted to elicit testimony from him about speaking with the driver of the truck to find out why the driver pulled in front of Fails's vehicle. Following an objection from defense counsel, a discussion was held at sidebar outside the hearing of the jury. The trial court sustained defense counsel's objection on hearsay grounds. Nevertheless, during closing argument, the following statements were made:

> [Prosecutor]: By the way, I'm gonna submit to you I wasn't able to elicit this in testimony, but it's my argument today that the truck is a good Samaritan driver.
>
> [Defense counsel]: I object, Judge. There's no evidence of that.

Trial Tr. 287.

{¶ 53} The trial court provided a limiting instruction to the jury informing them that arguments were merely the conclusions of counsel and that the evidence to consider was the testimony of the witnesses during trial. Immediately thereafter the following statements

20

were made:

> [Prosecutor]: Thank you, Judge. I appreciate that. So it's my argument today that this truck right here is a good Samaritan driver.
>
> [Defense counsel]: I object, Judge. There's no evidence to support it.
>
> [The Court]: I have now noted your objection, and I've instructed the jury that it is their decision to decide what evidence they received and what evidence they can draw from conclusions. It's up to the jury now. Proceed, [prosecutor].
>
> [Prosecutor]: Thank you, Judge. It's my argument today that this truck is a good Samaritan driver. Okay?
>
> Now, if you can imagine what his perspective is when he's looking straight ahead. You can't see it from this angle, but you can see Mr. Fails' vehicle slowly rolling up toward the intersection. You can see Officer Conley on foot chasing after that vehicle. This truck sees what's going on and says I need to help. That's why he cuts him off. All right? That's where we got to.

*Id.* at 288-289.

{¶ 54} Generally, counsel may comment during closing argument upon the evidence adduced at trial and what inferences can be drawn from the evidence. *State v. Diar*, 2008-Ohio-6266, ¶ 213. "However, it is improper for counsel to comment on evidence which was excluded or declared inadmissible by the trial court or otherwise make statements which are intended to get evidence before the jury which counsel was not entitled to have the jury consider." *Drake v. Caterpillar Tractor Co.*, 15 Ohio St.3d 346, 347 (1984).

{¶ 55} Here, the trial court made it clear that evidence of why the truck driver did what he did was inadmissible evidence based on hearsay. Trial Tr. 188-190. The prosecutor,

21

however, presented the argument as an inference based on the evidence presented at trial. Nevertheless, even if improper, the prosecutor's statements at issue were not pertinent to whether Fails failed to comply with Officer Conley's audible signal to stop or if there was a substantial risk of serious physical harm to persons or property. We cannot conclude that these statements prejudicially affected Fails's substantial rights where it is clear the jury would have found Fails guilty of a violation of R.C. 2921.331(B) even absent the alleged misconduct.

### b. Personal Statements

{¶ 56} During closing arguments, the prosecutor made the following statements:

> You need to hold him accountable today, members of the jury. Because it's people like him that are making our roads dangerous. I told you this is my hometown. I was born here. I grew up in Springfield. I went to school here.

Trial Tr. 292.

{¶ 57} Following defense counsel's objection, the parties discussed the statements outside the hearing of the jury. The prosecutor explained his comments stating that "I'm arguing what I think is gonna influence the jury. . . . I care about this community, Judge, and I know that the jurors do too." *Id*. at 293. After additional discussion, the trial court permitted the prosecutor to continue his summation but cautioned that injecting one's own opinions can "skirt the line of what is appropriate and not appropriate in closing arguments." *Id*. at 294.

{¶ 58} It is improper for a prosecuting attorney to make arguments or remarks likely to inflame the passions of the jurors, if intended to lead them to convict for an improper reason. *Berger v. United States*, 295 U.S. 78, 88 (1935). "The fact that the prosecutor

22

engaged in some improper argument, however, does not warrant reversal unless the remarks prejudicially affected substantial rights of the accused." *State v. LaMar*, 2002-Ohio-2128, ¶ 168, citing *State v. Hessler*, 90 Ohio St.3d 108, 125 (2000). "In making this determination, we must consider the effect of any misconduct in the context of the entire trial." *Id*., citing *State v. Keenan*, 66 Ohio St.3d 402, 410 (1993). "We must also view the prosecutor's closing argument in its entirety when determining prejudice." *Id*., citing *State v. Hill*, 75 Ohio St.3d 195, 204 (1996). "Where it is clear beyond a reasonable doubt that the jury would have found the defendant guilty, even absent the alleged misconduct, the defendant has not been prejudiced, and his conviction will not be reversed." *State v. Moody*, 2016-Ohio-8366, ¶ 108 (2d Dist.).

{¶ 59} The statements by the prosecutor here were inappropriate and were intended to improperly influence and inflame the jury based on his explanation to the court. Nevertheless, the statements were isolated, and it is clear beyond a reasonable doubt that the jury would have found the defendant guilty of a violation of R.C. 2921.331(B) even absent the misconduct. Moreover, the trial court instructed the jury that closing arguments were not evidence, which helped mitigate the effect, if any, of these limited statements.

### c. Facts not in evidence

{¶ 60} After explaining to the jury during closing argument that the enhancing element was "the one that's most contested," the prosecutor focused his argument on portraying how Fails's driving caused a substantial risk of serious physical harm to persons or property. In doing so, he displayed a Google map and discussed Fails's driving after turning onto Upper Valley Pike. The map was not identified during trial, was not an exhibit, and was not entered into the record. Fails did not object to the use of the map or the prosecutor's explanations of the roadways and Fails's driving. Accordingly, we review these allegations of

23

prosecutorial misconduct under a plain error analysis.

{¶ 61} In displaying the map to the jury, the prosecutor argued about whether Fails caused a substantial risk of serious physical harm to persons or property. The following statements were made:

Now, I'm going to show you exactly how he did. I pulled this map straight from Google maps. This is the location of the incident. You can see at the top there, there's the CVS pharmacy, and it intersects there Upper Valley Pike and Troy Road, also Route 41. And if I can just point right up here, this is the intersection where Mr. Fails and that truck kind of came head on with each other. All right?

Again, he needs to create a risk, not cause any kind of damage or any kind of injury, not whether serious physical harm happened, okay? Again, whether he created the risk of serious physical harm happening.

So I imagine that all of you are familiar with the Springfield area. I told you that I grew up here, I'm familiar with this area. But in case you don't know, Troy Road right here is a fairly busy street. Upper Valley Pike is also a fairly busy street. You can tell that there's all these businesses here, there's all these restaurants, there's all these other places, okay? There's traffic going on. There's a residential neighborhood right here. This road, Troy Road, is a downhill, okay? So Bechtle Avenue is somewhere over here, all right? I don't know if anybody has had the unfortunate luck of getting a speeding ticket on this road right here, but this road is dangerous to operate your vehicle on, just by the nature of where it's located and being a downhill coming from Bechtle Avenue. Okay? So this intersection is a dangerous intersection in

24

Springfield, all right?

. . .

I think everyone here can agree that recently there's been some accidents on the roads in our community. Just getting behind the wheel creates a risk of an accident; and when you operate the vehicle the way Mr. Fails did, that creates a substantial risk of serious physical harm.

All right. This is part two of the map that I've got right here. It's a little bit zoomed out, all right? This is the intersection that we were just talking about. Bechtle Avenue's right here. State Route 41, this is the downhill, Upper Valley Mall and Pike.

Now, if you remember Deputy Reynolds's testimony, he said that he was located right here on Shrine Road. I've got this little distance teller that Google maps has. It's just a little bit over a mile, all right, from the CVS to Shrine Road. Deputy Reynolds testified that when he saw Mr. Fails from Shrine Road, he was traveling at a high rate of speed; . . .

So at that high rate of speed, Mr. Fails goes through this busy intersection, he goes through this intersection, he goes through this intersection, he goes through this intersection, he goes through this intersection. How many did I just say, five? That's not even where he stopped. The car was found at his dad's house, okay? So you can draw the conclusion that he floored it from CVS all the way to his dad's house. That is a substantial risk of serious physical harm to persons or property.

Trial Tr. 281-285.

{¶ 62} In this case, the prosecutor did not merely summarize and argue what the

25

evidence had shown or what reasonable inferences could be drawn therefrom. Rather, the prosecutor recited facts not in evidence and displayed new evidence that was never presented at trial. No witness ever authenticated the maps or testified about the distance or some of the various locations mentioned by the prosecutor. Allowing the prosecutor to utilize this new evidence during closing argument for the first time eliminated defense counsel's opportunity to question any witness about the maps or cross-examine the testimonial statements made by the prosecutor. With respect to summation by prosecutors, "'improper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.'" *Keenan*, 66 Ohio St.3d at 406, quoting *Berger*, 295 U.S. at 88.

**{¶ 63}** Despite the lack of objection by defense counsel, this conduct was clearly improper. "'Neither the defense nor the prosecution may refer to evidence that is not in the record.'" *McKelton*, 2016-Ohio-5735, at ¶ 286, quoting *State v. Brown*, 38 Ohio St.3d 305, 316, fn. 7 (1988). This prohibition includes that "counsel should not state facts of his or her own personal experience during closing arguments." *Id*. While counsel should be accorded wide latitude in closing arguments, "'when he deliberately attempts to influence and sway the jury by a recital of matters foreign to the case, which matters he knows or ought to know cannot be shown by competent or admissible evidence, . . . it may constitute the basis for ordering a new trial or for the reversal by a reviewing court of a judgment favorable to the party represented by such counsel.'" *Drake,* 15 Ohio St.3d at 347-348, quoting *Maggio v. Cleveland*, 151 Ohio St. 136 (1949), paragraph two of the syllabus.

**{¶ 64}** We concluded in our resolution of the third and fourth assignments of error that there was insufficient evidence of a substantial risk of serious physical harm to persons or property. The bulk of the prosecutor's objectionable summation was focused on that

26

element. Since we already modified Fails's conviction from a third-degree felony to a first-degree misdemeanor, we cannot say that the prosecutor's misconduct had any bearing on the fairness of Fails's trial on the misdemeanor charge for which the evidence was overwhelming. Moreover, the trial court instructed the jury that closing arguments are not evidence, which this court presumes the jury followed. *LaMar*, 2002-Ohio-2128, at ¶ 92. It is clear beyond a reasonable doubt that, absent the prosecutor's misconduct, the jury would have found Fails guilty of failure to comply in violation of R.C. 2921.331(B). Accordingly, Fails's second assignment of error is overruled.

## V. Fifth Assignment of Error

{¶ 65} In his fifth assignment of error, Fails raises the following issue:

The trial court erred by not properly instructing the Jury in regard to their

role in evaluating the evidence.

{¶ 66} According to Fails, the trial court's curative instructions to the jury were erroneous. He specifically points to two limiting instructions given by the judge during closing argument. The first instruction was given following defense counsel's objection to the prosecutor's statement about the truck driver being a good Samaritan, which was discussed above in the second assignment of error.

{¶ 67} The second instruction was given following defense counsel's objection regarding the prosecutor's personal statements. The following statements were made:

[Defense counsel]: I would ask that you put on an instruction to the jury about

opinions as opposed to evidence, what the evidence shows.

The Court: Well, I think, [defense counsel], that you're going to have a

different opinion of what the evidence shows. So I think that's the entire idea

of closing arguments is that counsel for both sides will have opinions on what

27

the evidence shows; but as I've already told or instructed the jury, that the only opinion of what the evidence shows that really matters is the 12 jurors individually and collectively.

So, again, I'm going to remind you of that, ladies and gentlemen, as we're going through these closing arguments, that ultimately it's up to you to decide what evidence you received and how to interpret that; and you will do that individually and collectively as a group once you return to the jury room.

Trial Tr. 295-296.

**{¶ 68}** Fails did not object to either of the above instructions at trial and therefore we only review for plain error. *State v. Leonard*, 2004-Ohio-6235, ¶ 118. The trial court's instructions were given during closing arguments when the prosecutor was explaining his perspective of what the evidence showed. Read as a whole, the challenged instructions attempted to inform the jury that the jury had to decide what inferences, if any, to make based on the evidence provided to them. Any possibility the jury may have been misled or confused was cured by the trial court's subsequent instructions to the jurors that closing arguments were not evidence and any inferences rested entirely with the jury. We cannot conclude that the outcome of the trial would clearly have been different but for the alleged errors. Accordingly, the trial court did not commit plain error by giving the two instructions at issue.

**{¶ 69}** Fails's fifth assignment of error is overruled.

### VI. Cumulative Error

**{¶ 70}** Fails's sixth assignment of error states as follows:

The cumulative errors during the trial warrant reversal.

**{¶ 71}** Pursuant to the cumulative error doctrine, "a conviction will be reversed where

the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal." *State v. Garner*, 74 Ohio St.3d 49, 64 (1995). "In order to find cumulative error, we must find: (1) that multiple errors were committed at trial, and (2) there is a reasonable probability that the outcome of the trial would have been different but for the combination of the separately harmless errors." *Goldblum*, 2014-Ohio-5068, at ¶ 58 (2d Dist.), citing *State v. Kelly*, 2005-Ohio-305, ¶ 33 (2d Dist.).

**{¶ 72}** Fails generally argues that the trial included multiple errors which, collectively, resulted in the denial of a fair trial. He does not, however, point to specific instances of alleged error in the record but appears to rely on the errors alleged in his prior assignments of error. As noted above, we will modify Fails's conviction from the third-degree felony version of the offense to the first-degree misdemeanor version of the offense. However, none of the errors committed in this case, when considered either individually or cumulatively, resulted in prejudicial error sufficient to warrant reversal of the underlying conviction for failure to comply with an order or signal of a police officer.

**{¶ 73}** The sixth assignment of error is overruled.

## VII.    Conclusion

**{¶ 74}** Having sustained in part Fails's third and fourth assignments of error, we modify the judgment to reflect a conviction for failure to comply with an order or signal of a police officer, in violation of R.C. 2921.331(B), a misdemeanor of the first degree. We remand the cause for the trial court to resentence Fails accordingly. The judgment of the trial court is affirmed in all other respects.

. . . . . . . . . . . . .

EPLEY, P.J., and TUCKER, J., concur.

29