[Cite as *State v. Dominguez-Olivia*, 2026-Ohio-484.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | C.A. No. 2025-CA-19 |
| Appellee | : | |
| | : | Trial Court Case No. 2022 CR 0232 |
| v. | : | |
| | : | (Criminal Appeal from Common Pleas |
| ALAN E. DOMINGUEZ-OLIVIA | : | Court) |
| | : | |
| Appellant | : | **FINAL JUDGMENT ENTRY &** |
| | : | **OPINION** |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on February 13, 2026, the judgment of the trial court is affirmed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

*Christopher B. Epley*

CHRISTOPHER B. EPLEY, JUDGE

HUFFMAN, J., and HANSEMAN, J., concur.

ROBERT ALAN BRENNER, Attorney for Appellant
MEGAN A. HAMMOND, Attorney for Appellee

EPLEY, J.

{¶ 1} Alan E. Dominguez-Oliva appeals from his convictions in the Greene County Court of Common Pleas of failure to comply with an order or signal of a police officer, a third-degree felony, and assault, a fourth-degree felony. He claims that his convictions were against the manifest weight of the evidence. For the following reasons, the trial court's judgment is affirmed.

## I. Facts and Procedural History

{¶ 2} According to the State's evidence at trial, at approximately 9:30 p.m. on May 18, 2022, Trooper (now Sergeant) Joshua Jones of the Ohio State Highway Patrol was dispatched to eastbound Interstate 70 on a report of a reckless driver in a white Kia with an Illinois license plate. Jones waited for the Kia on the right shoulder, just west of the intersection with Interstate 75. At 9:37 p.m., the Kia passed him. Jones got behind it and observed a marked lane violation. He activated his overhead lights to initiate a traffic stop. When it became apparent that the Kia would not pull over, the trooper also activated his siren. The driver, Dominguez-Oliva, again failed to comply, and an extended pursuit ensued.

{¶ 3} While on Interstate 70, Dominguez-Oliva reached a maximum speed of well over 100 mph. More than once, he acted as if he were going to take an exit and then veered back onto the interstate. At the exit for State Route 201 (Exit 38), Dominguez-Oliva took the exit, ran the red light at the bottom of the ramp, and reentered the highway. He repeatedly wove around vehicles, including semi-trucks, and passed a truck on the right shoulder.

2

**{¶ 4}** Dominguez-Oliva took the exit for Interstate 675, traveling approximately 85 mph. He then took the first off-ramp, proceeded straight to the on-ramp across the street from the exit, contrary to the lane markings, and returned to the interstate. At 9:50 p.m., he exited Interstate 675 again and headed east on Dayton-Yellow Springs Road. He ran multiple red lights before turning left onto State Route 235. He sped along State Route 235 at about 80 mph. At several points, Dominguez-Oliva drove in the oncoming lane of the two-lane road, once barely making it back to the correct lane when a car came in his direction. Dominguez-Oliva again headed toward the interchange with Interstate 675, where Fairborn police officers deployed tire deflation devices (Stop Sticks) at two locations, spiking all four of the Kia's tires. Dominguez-Oliva continued to Fairborn, and by that point, his tires had deflated and his speed had dropped to approximately 20 mph. He still did not stop.

**{¶ 5}** Dominguez-Oliva led Jones and other troopers around Fairborn, and at approximately 10:00 p.m., OSHP Sergeant Bradley Hess authorized units to try to box in the Kia and bring it to a controlled stop. Dominguez-Oliva evaded the attempt by driving into the wrong lane and then back over a median. Trooper Tyler Goubeaux moved in front of the Kia, and Dominguez-Oliva rear-ended him. Goubeaux tried to block in the Kia from the passenger side, but the Kia struck the driver's front quarter-panel of the cruiser. The Kia kept going, losing its rear bumper in the process. Sergeant Hess authorized Goubeaux to execute a Precision Immobilization Technique ("PIT") maneuver, which was intended to spin and stop the Kia. At 10:05 p.m., 10:06 p.m., and 10:09 p.m., Goubeaux successfully performed the maneuver at points along South Maple Avenue, but Dominguez-Oliva was not stopped; after the second time, he drove through a resident's yard to evade capture.

**{¶ 6}** Ultimately, at 10:12 p.m., Goubeaux executed another PIT maneuver while on State Route 444, just east of North Maple Avenue. The Kia spun, began to drive in the

3

opposite direction, and hit the passenger side of Trooper Dunlap's cruiser. Dominguez-Oliva put his car in reverse and accelerated into Goubeaux's cruiser. Trooper Jones came around the front of the Kia and drove into it to block him. Goubeaux then hit the rear of the Kia to wedge it in. Goubeaux's cruiser was later determined to be a total loss.

{¶ 7} Jones got out of his cruiser, drew his weapon, and ordered Dominguez-Oliva to show his hands. Dominguez-Oliva did not comply, and Jones observed him ingesting "handfuls of pills." Out of fear that Dominguez-Oliva would overdose, Jones called for a medic. Goubeaux executed a window punch and broke the front passenger window so he could unlock the door. He saw Dominguez-Oliva go limp. Sergeant Hess entered the front passenger door and turned off the Kia. Goubeaux then entered the car and cut Dominguez-Oliva's seat belt so other troopers could remove him from the vehicle.

{¶ 8} Troopers pulled Dominguez-Oliva from the Kia and placed him on the ground. Originally, he was still, but he suddenly lunged for Hess's duty belt. Hess backed away, and Dominguez-Oliva started kicking and flailing his legs. Hess then tased Dominguez-Oliva, hoping to immobilize him. When the taser did not incapacitate Dominguez-Oliva, Hess "drive-stunned" him with the taser on his calf, causing pain. The troopers were then able to handcuff Dominguez-Oliva; they also placed flex-cuffs (thick zip ties) on his ankles to prevent him from kicking again. Hess was kicked twice during the process of arresting Dominguez-Oliva.

{¶ 9} Medics transported Dominguez-Oliva to the hospital for evaluation and treatment, and he was accompanied by Trooper Jones. Due to a miscommunication between OSHP and the hospital's police department, Dominguez-Oliva was later discharged from the hospital.

{¶ 10} On May 27, 2022, Dominguez-Oliva was indicted for (1) failure to comply with an order or signal of a police officer, with the specification that he caused a substantial risk of serious physical harm to persons or property, (2) assault on a peace officer (Sergeant Hess), and (3) felonious assault on a peace officer (Trooper Goubeaux) with a deadly weapon. He was arrested on August 11, 2024, more than two years later.

{¶ 11} The matter proceeded to a jury trial on January 13, 2025. Jones, Hess, and Goubeaux testified for the State, and the prosecution presented three cruiser videos and two body-worn camera videos from the incident. Dominguez-Oliva offered no evidence in his defense. After deliberating, the jury found him guilty of failure to comply (including the specification that his operation of the motor vehicle caused a substantial risk of serious physical harm to persons or property) and assault on a peace officer. The jury could not reach a verdict on felonious assault, and that count was later dismissed. At sentencing, the trial court imposed consecutive sentences totaling 54 months in prison and ordered Dominguez-Oliva to pay a fine of $5,000, plus court costs. Dominguez-Oliva's driver's license was suspended for life.

{¶ 12} Dominguez-Oliva appeals from his convictions, raising one assignment of error.

## II. Manifest Weight of the Evidence

{¶ 13} Dominguez-Oliva's assignment of error claims that his convictions were against the manifest weight of the evidence.

{¶ 14} "A weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *State v. Wilson*, 2009-Ohio-525, ¶ 12; *see Eastley v. Volkman*, 2012-Ohio-2179, ¶ 19. When reviewing an argument challenging the

weight of the evidence, an appellate court may not substitute its view for that of the trier of fact. Rather, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

**A. Substantial Risk of Serious Physical Harm to Persons or Property**

{¶ 15} Dominguez-Oliva first asserts that the jury's finding on the specification to the failure to comply charge—that his operation of the Kia caused a substantial risk of serious physical harm to persons or property—was against the manifest weight of the evidence. He argues that traffic was light and posits that due to the absence of such risk, OSHP did not terminate the pursuit for the safety of the public. He further contends that the only substantial risk to property was caused by the officers who hit him with their vehicles.

{¶ 16} The failure to comply statute provides: "No person shall operate a motor vehicle so as willfully to elude or flee a police officer after receiving a visible or audible signal from a police officer to bring the person's motor vehicle to a stop." R.C. 2921.331(B). In May 2022, a violation of R.C. 2929.331(B) was a first-degree misdemeanor. *See* former R.C. 2921.331(C)(3). Since October 24, 2024, it has been a fourth-degree felony. 2024 Sub.H.B. 56. Dominguez-Oliva does not dispute that he violated R.C. 2921.331(B).

{¶ 17} A violation of R.C. 2921.331(B) is elevated to a third-degree felony if the "operation of the motor vehicle by the offender caused a substantial risk of serious physical harm to persons or property." R.C. 2921.331(C)(5)(a)(ii). "Serious physical harm to persons"

6

includes, among other things, physical harm that involves some permanent incapacity or death. R.C. 2901.01(A)(5)(b) and (c). "Serious physical harm to property" means physical harm that results in a substantial loss of value, temporarily prevents or substantially interferes with the use or enjoyment of the property for an extended time period, or requires substantial time, effort, or money to repair or replace the property. R.C. 2901.01(A)(6). "Substantial risk" is defined as "a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist." R.C. 2901.01(A)(8); *State v. Fails*, 2025-Ohio-4680, ¶ 38 (2d Dist.).

{¶ 18} Evidence that a defendant traveled at a high rate of speed, maneuvered around cars, and drove left of center to pass a vehicle is sufficient to prove that a defendant was driving in a manner that posed a substantial risk of physical harm to persons or property. *E.g., State v. Akins*, 2025-Ohio-5632, ¶ 23 (8th Dist.). *Compare State v. Fails*, 2025-Ohio-4680, ¶ 38-46 (2d Dist.) (finding insufficient evidence to support enhancement under R.C. 2921.331(C)(5)(a)(ii)).

{¶ 19} In this case, we cannot conclude that the jury's finding on the specification was against the manifest weight of the evidence. Trooper Jones was directly behind Dominguez-Oliva's vehicle from the start of the pursuit until they were in Fairborn. Jones testified, and his cruiser video substantiated, that Dominguez-Oliva drove on Interstate 70 at speeds between 80 and over 100 mph. He wove between lanes, acted as if he were going to take exits but did not, and passed a semi-truck in the right shoulder. At the exit to State Route 202, he took the exit, ran the red light, and reentered the highway. Later, after taking the exit for Dayton-Yellow Springs Road, he ran multiple red lights and had to swerve to avoid another vehicle in one of the intersections. While on State Route 235, a two-lane road, he traveled in the lane for oncoming traffic and twice had to return to the correct lane for

7

oncoming vehicles. As he approached the Interstate 675 overpass, he crossed the double-yellow lines to pass vehicles.

{¶ 20} Fairborn officers successfully deployed Stop Sticks at approximately 9:55 p.m., and Trooper Jones could see that all four tires had been spiked. He testified that this would have dramatically hindered the driver's ability to operate the motor vehicle. The car would have effectively been driving on the rims, resulting in minimal traction with the roadway and making it hard to maneuver and come to a stop. Jones stated that he expected the Kia's driver to stop and run on foot. However, Dominguez-Oliva continued to drive the Kia, albeit at slower speeds, for almost 20 more minutes, running more red lights in Fairborn, weaving, crossing into the wrong lane, jumping a median, and driving through a residential yard to evade the officers. Although traffic was light, other cars were on the road nearby as he did so. When troopers tried to bring him to a controlled stop, he repeatedly maneuvered around them at close quarters, hit Trooper Goubeaux's vehicle twice, and ultimately forced the troopers to intentionally run into his vehicle to stop him. Several cruisers were damaged by Dominguez-Oliva's hitting them, and Goubeaux's cruiser was totaled.

{¶ 21} Under these circumstances, the jury reasonably found that Dominguez-Oliva's operation of his vehicle caused a substantial risk of serious physical harm to persons or property. Dominguez-Oliva's conviction for failure to comply with an order or signal of a police officer with the specification was not against the manifest weight of the evidence.

### B. Assault on a Peace Officer: Voluntariness

{¶ 22} Dominguez-Oliva next challenges his conviction for assault. He argues that his actions were not voluntary and instead were the result of being drive-stunned by Sergeant Hess's taser.

8

**{¶ 23}** Dominguez-Oliva was convicted of assault in violation of R.C. 2903.13(A), which prohibits a person from knowingly causing or attempting to cause physical harm to another. The jury further found that the victim was a peace officer in the performance of his official duties, which made the assault a felony of the fourth degree. R.C. 2903.13(C)(5)(a).

**{¶ 24}** To be convicted of a criminal offense, a defendant's conduct must have been both voluntary and performed with the requisite degree of culpability (purpose, knowledge, recklessness, or negligence). *See* R.C. 2901.21(A) and 2901.21(F)(3). Of relevance here, "[a] person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). Proof that the defendant committed a criminal act with the requisite mental state is necessarily evidence that the defendant acted voluntarily. *State v. Ireland*, 2018-Ohio-4494, ¶ 34.

**{¶ 25}** "Culpable mental states are frequently demonstrated through circumstantial evidence." *State v. Hypes*, 2019-Ohio-4096 ¶ 21 (2d Dist.), quoting *State v. Fox*, 2018-Ohio-501, ¶ 14 (10th Dist.). Circumstantial evidence has the same probative value as direct evidence. *State v. Jenks*, 61 Ohio St.3d 259, 272 (1991); *State v. St. John*, 2019-Ohio-650, ¶ 49 (2d Dist.). In some cases, "circumstantial evidence may be more certain, satisfying, and persuasive than direct evidence." *State v. Jackson*, 57 Ohio St.3d 29, 38 (1991). A defendant's state of mind may be inferred from the totality of the circumstances. *State v. Murphy*, 2018-Ohio-3506, ¶ 16 (2d Dist.).

**{¶ 26}** Involuntary acts include "reflexes, convulsions, body movements during unconsciousness or sleep, and body movements that are not otherwise a product of the actor's volition." R.C. 2901.21(F)(2). A claim that the defendant did not commit the act voluntarily is an affirmative defense. *Ireland*, 2018-Ohio-4494.

9

**{¶ 27}** At trial, Jones, Goubeaux, and Hess each stated that Dominguez-Oliva was non-compliant and combative after being removed from his vehicle and placed on the ground. Hess and Goubeaux testified that Dominguez-Oliva tried to kick Hess prior to Hess's deploying his taser. Hess's body-worn camera video showed Dominguez-Oliva on his right side, looking at Hess, when he lunged and reached toward Hess with his left hand. After Hess jumped back, Dominguez-Oliva could be seen kicking toward Hess just before the taser was deployed. Hess testified that he was kicked twice by Dominguez-Oliva.

**{¶ 28}** Jones testified that Dominguez-Oliva kicked at Sergeant Hicks at two different points during the arrest process, and the trooper specifically stated that he did so after being tased. Jones's body-worn camera did not clearly show Dominguez-Oliva's legs prior to his lunging at Hess, but it substantiated that Dominguez-Oliva kicked Hess as he tried to press the taser onto Dominguez-Oliva's left leg.

**{¶ 29}** It was the province of the jury, as the trier of fact, to determine whether the State had proven beyond a reasonable doubt that Dominguez-Oliva knowingly caused or attempted to cause physical harm to Hess. Here, the State's evidence supported a reasonable conclusion that Dominguez-Oliva was in control of his body and had acted voluntarily when he kicked at and actually connected with Hess. Accordingly, we cannot conclude that the jury lost its way when it found Dominguez-Oliva guilty of assault.

**{¶ 30}** Dominguez-Oliva further asserts that he did not intend to cause Hess physical harm when he kicked and flailed. However, the State was required to prove that Dominguez-Oliva acted *knowingly*, not his subjective intent. Regardless of his intent, the jury could have reasonably found that Dominguez-Oliva had knowingly caused or attempted to cause physical harm when he voluntarily kicked his legs at Hess, who was in close proximity and

10

trying to place him in custody. Dominguez-Oliva's conviction for assault on Hess was not against the manifest weight of the evidence.

{¶ 31} Dominguez-Oliva's assignment of error is overruled.

### III. Conclusion

{¶ 32} The trial court's judgment is affirmed.

. . . . . . . . . . . . .

HUFFMAN, J., and HANSEMAN, J., concur.